IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>ex. rel. J.D. JENKINS,<br>ex. rel. ELIZABETH COYLE,<br>ex. rel. ELIZABETH MERRY<br><br>STATE OF TENNESSEE,<br>ex rel. J.D. JENKINS,<br>ex rel. ELIZABETH COYLE,<br>ex. rel. ELIZABETH MERRY,<br><br>     Plaintiffs/Relators,<br><br>v.<br><br>PHYSICIANS CHOICE LABORATORY<br>SERVICES, LLC ("PCLS"),<br>DOUGLAS R. SMITH, M.D., PHILIP MCHUGH, JR.,<br>MARCUS SOWINSKI, JOE WIEGEL,<br><br>MEDX SOFTWARE, INC.,<br>MEDXSOFTWARE DEVELOPMENT, LLC,<br>SHAUN THOMPSON,<br>DOUG WOLVERTON,<br><br>LABORATORY EQUIPMENT HOLDINGS, LLC,<br>DCW FAMILY HOLDINGS, LLC,<br>DRS 2011 FAMILY TRUST,<br>SILENT STORM HOLDINGS, LLC,<br>RIVERWALK HOLDINGS OF SOUTH CAROLINA,<br>SMITH CLOVIS CAPITAL HOLDINGS, LLC,<br><br>CFC-KNOXVILLE (AJS-1), PLLC, d/b/a<br>COMPLETE FAMILY CARE, PLLC,<br>PA-KNOXVILLE (AJS-2), PLLC, d/b/a<br>POUNDS A WEIGH, PLLC,<br>FRAN (PACHINGER) INCANDELA, and<br>DR. ANDREW SUGANTHARAJ,<br><br>SOUTHEAST SPINE & PAIN ASSOCIATES, LLC,<br>JEAN N. MCGUIRE, III, M.D.,<br>OPTIMAL MEDICAL MANAGEMENT, LLC,<br>OPTIMAL MEDICAL MANAGEMENT OF | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No.:   _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

1

TENNESSEE, LLC, JAMES D. LORD, )
CHRISTIE LORD, a/k/a CHRISTIE M. LASATER, )
PORTIA HUTCHINSON, )
 )
ADVANCED PAIN THERAPEUTICS OF )
KNOXVILLE, TN, LLC, SONIA CREWS-FOSTER, )
 )
SPECIALISTS IN PAIN MANAGEMENT, P.C./ )
SOUTHERN PAIN SPECIALISTS, PLLC, )
 )
VITALITY CENTERS, LLC, )
VITALITY PHYSICIANS, PA )
 )
BEARDEN HEALTHCARE ASSOCIATES, P.C., )
 )
GREATER KNOXVILLE MEDICAL CENTER, LLC )
 )
AMERICAN RX, INC., )
AEGIS COMPOUNDING PHARMACY, LLC, )
AMERICAN COMPOUNDING, INC., )
CELLULAR SCIENCES, LLC., )
VITALITY LABS, LLC., and JOHN DOES 35-50, )
 )
 Defendants. )
– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – )
 )
J.D. JENKINS, )
 )
 Plaintiff, )
 )
v. )
 )
OPTIMAL MEDICAL MANAGEMENT, LLC, and )
SOUTHEAST SPINE & PAIN ASSOCIATES, LLC, )
 )
 Defendants. )

---

## FALSE CLAIMS ACT COMPLAINT

---

Relators, J.D. Jenkins, Elizabeth Coyle and Elizabeth Merry, through their attorneys and

on behalf of the United States of America and the State of Tennessee, for their Complaint against

Physicians Choice Laboratory Services, LLC ("PCLS"), Douglas R. Smith, M.D., Philip

2

McHugh, Jr., Marcus Sowinski, Joe Wiegel, Medxsoftware, Inc., Medxsoftware Development, LLC, Shaun Thompson, Doug Wolverton, Laboratory Equipment Holdings, LLC, DCW Family Holdings, LLC, DRS 2011 Family Trust, Silent Storm Holdings, LLC, Riverwalk Holdings of South Carolina, Smith Clovis Capital Holdings, LLC, CFC-Knoxville (AJS-1), PLLC, d/b/a Complete Family Care, PLLC, PA-Knoxville, (AJS-2), PLLC, d/b/a Pounds A Weigh, PLLC, Fran (Pachinger) Incandela, Dr. Andrew Sugantharaj, Southeast Spine & Pain Associates, LLC, Jean N. McGuire, III, M.D., Optimal Medical Management, LLC, Optimal Medical Management of Tennessee, LLC, James D. Lord, Christie Lord, a/k/a Christie M. Lasater, Portia Hutchinson, Advanced Pain Therapeutics of Knoxville, TN, LLC, Sonia Crews-Foster, Specialists in Pain Management, P.C./Southern Pain Specialists, PLLC, Vitality Centers, LLC, Vitality Physicians, P.A., Bearden Healthcare Associates, P.C., Greater Knoxville Medical Center, LLC, American RX, Inc., Aegis Compounding Pharmacy, LLC, American Compounding, Inc., Cellular Sciences, LLC, Vitality Labs, LLC, and John Does 35-50, hereby allege as follows:

## I.   TABLE OF CONTENTS

II.    Nature of the Case ................................................................................................5

III.    Pre-filing Disclosure ...........................................................................................7

IV.    Jurisdiction and Venue.........................................................................................7

V.    Summary of Allegations ......................................................................................8

VI.    Background ........................................................................................................14
       A. The Opioid Epidemic In America And The Increased Cost To Medicare, To Other
       Governmental Payors, And to Society As A Result Of Drug Abuse...........................14

VII.    The Relators .......................................................................................................17
       A. Relator, James D. Jenkins ("J.D. Jenkins") ................................................17
       B. Relator, Elizabeth Coyle .............................................................................21
       C. Relator, Elizabeth Merry.............................................................................23

VIII.    Source of Relators' Allegations .........................................................................24

Case 3:17-cv-00046-FDW-DSC   Document 2   Filed 01/07/14   Page 3 of 123

IX.   The Defendants .................................................................................................24
      I.    Physicians Choice Laboratory Services, LLC ("PCLS") .....................24
      II.   Douglas R. Smith, "M.D." (License revoked) .......................................32
      III.  Medx Software, Inc./Medxsoftware Development, LLC. .....................43
      IV.   Shaun Thompson .................................................................................45
      V.    Complete Family Care, PLLC .............................................................47
      VI.   Optimal Medical Management, LLC, and Defendants, James D. Lord And Christie
            Lord a/k/a Christie M. Lasater ............................................................54
      VII.  Southeast Spine & Pain Associates, LLC ............................................58
      VIII. Specialists in Pain Management, P.C./Southern Pain Specialists, PLLC .............70
      IX.   Bearden Healthcare Associates, P.C. ...................................................71
      X.    Greater Knoxville Medical Center, LLC ..............................................72
      XI.   Vitality Centers, LLC/Vitality Physicians, PA ....................................73
      XII.  American RX, Inc./Aegis Compounding Pharmacy, LLC/American
            Compounding, Inc./Cellular Sciences, LLC/Vitality Labs, LLC ........................74

X.    Narrative of Particulars .....................................................................................75
      A.    Physicians Choice Laboratory Services, LLC:   Kickbacks ..................................75
      B.    Doug Smith, Shaun Thompson, Physicians Choice Laboratory Services (PCLS),
            Their Associates And/Or Affiliated Companies Provided Kickbacks To Optimal
            Medical Management, LLC, To Southeast Spine And Pain Associates, LLC, To
            Complete Family Care, To Bearden Healthcare Associates, P.C., To Specialists In
            Pain Management, P.C., To Greater Knoxville Medical Center, LLC, And To Other
            Medical Practices In Return For Sending Lab Referrals To PCLS ......................75
      C.    Physicians Choice Laboratory Services, LLC:   Overutilization Involving
            Confirmation Labs ..............................................................................95
      D.    Additional Allegations Involving Southeast Spine & Pain Associates, LLC ........97
            1. Overutilization Of In-House Urinalysis Labs ...................................97
            2. Overutilization of Psychological Self-Tests ....................................100
            3. Upcoding Involving In-House Labs................................................100
            4. Nurse Practitioner Seeing Patients And Writing Prescriptions For Controlled
               Substances Who Had Failed To Pass Her Renewal For Her Board Certification
               To Be A Nurse Practitioner ........................................................102
      E.    Additional Allegations Involving Complete Family Care ...................................104
            1.  Overutilization of In-House Urinalysis Labs.................................104
            2.  Overutilization of Psychological Self-Tests .................................104
            3.  Upcoding:   Low Back Pain........................................................104
            4.  Upcoding:   Diabetes Patients....................................................105
            5.  Chad Adams, A Physicians Assistant, Seeing Patients Without A License, And
                Dr. Sugantharaj Pre-Signing Prescriptions ...................................106
            6.  Unlicensed Nurse Seeing Patients And Providers Unlicensed For Suboxone
                Seeing Patients ........................................................................108
            7.  Suboxone Issues ......................................................................109
            8.  HDL Lab Fraud/Unnecessary Office Visits................................109
      F.    Additional Allegations Involving Other Clinics Receiving Kickbacks From Shaun

4

Thompson/Douglas Smith/PCLS ........................................................110

XI.   Specific Counts and Relief Sought ............................................110
COUNT ONE..............................................................................................111
COUNT TWO..............................................................................................112
COUNT THREE..........................................................................................113
COUNT FOUR ...........................................................................................113
COUNT FIVE..............................................................................................114
COUNT SIX ...............................................................................................114
COUNT SEVEN.........................................................................................115
COUNT EIGHT...........................................................................................115
COUNT NINE.............................................................................................116
COUNT TEN...............................................................................................117
COUNT ELEVEN.......................................................................................117
COUNT TWELVE ......................................................................................118
COUNT THIRTEEN ...................................................................................118
COUNT FOURTEEN..................................................................................119
COUNT FIFTEEN.......................................................................................119
COUNT SIXTEEN ......................................................................................120

PRAYER FOR RELIEF ...............................................................................120
CERTIFICATE OF SERVICE ....................................................................123

## II.   NATURE OF THE CASE

1.    The Relators hereby file a Complaint under the qui tam provisions of the United States False Claims Act, 31 U.S.C. § 3729, et seq. (FCA), and the Fraud & Abuse Statutes, 42 U.S.C. §§ 1320a-7a & -7b.

2.    The False Claims Act provides, inter alia, that any person who knowingly submits a false or fraudulent claim to the Federal government for payment or approval is liable to the government for a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each claim, plus three times the amount of the false claim.   31 U.S.C. § 3729(a).   Suits brought under the Act may include false claims made within six years of the date of the filing.   The Act also permits assessment of the civil penalty even without proof of specific damages.   Rex Trailer Co. v. U.S., 350 U.S. 148 (1956).

5

3.      The Anti-Kickback Statute, (42 U.S.C. § 1320a-7b), in relevant part, makes it illegal to knowingly and willfully offer, <u>pay</u>, solicit or <u>receive</u> any remuneration "directly or indirectly, overtly or covertly, in cash or in kind" to induce or reward referrals of items or services reimbursable by a Federal health care program.   Where remuneration is paid, received, offered, or solicited purposefully to induce or reward referrals of items or services payable by a Federal health care program, section 1320a-7b provides for criminal penalties and section 1320a-7a provides for civil monetary penalties.   Among other negative results, kickbacks in health care can lead to:

- Overutilization;
- Increased program costs;
- Corruption of medical decision-making;
- Patient steering; and
- Unfair competition.

4.      The Anti-Kickback Statute also provides that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for the purpose of" the False Claims Act, 31 U.S.C. § 3729, *et. seq*.

5.      The Physician Self-Referral Law, 42 U.S.C. § 1395nn, commonly referred to as the Stark Law, prohibits physicians from referring to receive "designated health services" payable by Medicare or Medicaid from entities with which the physician or an immediate family member has a financial relationship, unless an exception applies.   Financial relationships include both ownership/investment interests and compensation arrangements.   "Designated health services" include "<u>clinical laboratory services</u>".

6.      The Stark Law is a strict liability statute, which means proof of specific intent to violate the law is not required.   The Stark Law prohibits the submission, or causing the

6

submission, of claims in violation of the law's restrictions on referrals. Penalties for physicians who violate the Stark Law include fines as well as exclusion from participation in Federal health care programs.

### III. PRE-FILING DISCLOSURE

7.     Prior to filing this False Claims Act Complaint, the Relators made pre-filing disclosures of the allegations contained herein.    The Relators are therefore original sources of the allegations set forth herein.

### IV. JURISDICTION AND VENUE

A federal court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1345 (United States as Plaintiff), and 31 U.S.C. §§ 3729-3733 (False Claims Act).  In addition, to promote judicial efficiency, a federal court may exercise supplemental jurisdiction over claims under Tennessee common law and violations of the Tennessee Medicaid False Claims Act, T.C.A. § 71-5-181, et seq., pursuant to 28 U.S.C. § 3732(b) and 28 U.S.C. § 1367(a), in that all state created claims pleaded or that may be pleaded in this case arise out of a common nucleus of operative facts.

Moreover a federal court in the Eastern District of Tennessee has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants are located and does business in the Eastern District of Tennessee.   Venue lies within the Eastern District of Tennessee pursuant to 28 U.S.C. §§ 1391(b) and (c) and 31 U.S.C. § 3732(a) because the acts and practices alleged in Relators' Complaint occurred in this District.

### V. SUMMARY OF ALLEGATIONS

8.     The Relators hereby allege, among other illegal actions, that during the period

from in or before 2009, and continuing through the date of the filing of the Complaint, the Defendants have either:

(a)     paid remuneration to induce and/or reward referrals to Physicians Choice Laboratory Services, LLC, ("PCLS"), or

(b)     they received remuneration for making such referrals.

This scheme resulted in millions of dollars in excessive, unnecessary and fraudulent laboratory charges that were paid by Federal and State healthcare programs, such as Medicare, TriCare, Medicaid, and TennCare (as well as such charges being paid by self-pay patients and private insurance companies).

9.     This scheme, as described herein, also resulted in millions of dollars of medically unnecessary laboratory charges and massive overutilization of laboratory services.   It also corrupted medical decision-making and resulted in unfair competition.   The kickback scheme primarily targets pain clinics, but it is believed that PCLS is branching out to other medical providers, including men's health, women's health, and cardiology.

10.     The owners, associates, and/or affiliates of Physicians Choice Laboratory Services, LLC, ("PCLS") devised a scheme to provide valuable remuneration through various straw companies to willing medical providers (primarily pain clinics) who agreed to use PCLS exclusively and who agreed to steer millions of dollars of laboratory business to PCLS.   These pain clinics engaged in a pattern of ordering millions of dollars of "confirmation" laboratory tests (and other laboratory tests) through PCLS that they knew were medically unnecessary.   The kickback conspiracy scheme continues to evolve, but Relators have discovered that to date, the remuneration provided directly or indirectly by PCLS, includes providing free computers, free

8

software[1], free computer servicing, free equipment, free furniture, free consulting services, free big screens, free computer screens, free printers, free urine analyzers, free or low cost reagents, and furnishing free employees that the medical providers can use for non-PCLS purposes.

11. The Relators also discovered that on at least one occasion, Defendant, Douglas R. Smith, a former medical doctor and one of the "founding fathers" of PCLS, apparently provided $300,000.00, directly or indirectly through one of his businesses or his trusts, towards the purchase of a pain clinic (Advanced Pain Therapeutics of Knoxville, LLC, which later became Southeast Spine & Pain Associates, LLC). The Relators believe that Defendant, Douglas R. Smith, and/or his proxy may have retained an ownership interest in this particular pain clinic. The Relators have reason to believe that this financing/acquisition pattern may have occurred with respect to other pain clinics/medical providers which in turn receive kickbacks and funnel laboratory business to PCLS.

12. The Relators have learned that the clinics implicated in the kickback scheme with PCLS engage in other fraudulent conduct designed to increase their revenue at the expense of governmental programs, which include:

    (a) Sending out <u>100%</u> of their in-house urinalysis labs to PCLS for "confirmation" when this is not medically necessary.

    (b) Performing and charging for <u>monthly</u> in-house urinalysis labs on patients when this is not medically necessary.

---

[1]The free software includes psychological "self-testing" software. The clinics bill Medicare for the psychological self-tests using CPT code 96103, billing $130.00 of which Medicare pays $57.98. At Southeast Spine & Pain Associates, LLC, approximately 35 patients per day (or 700 patients per month) take this psychological self-test which consists of the patients sitting at a computer (also provided for free) for approximately 10-15 minutes and answering questions. At approximately 700 tests per month, the extra revenue can amount to approximately $40,000.00 per month per pain clinic at zero cost to the pain clinics!

9

(c) Performing and charging for <u>monthly</u> psychological self-tests on patients using software furnished by PCLS which is not medically necessary.

(d) Engaging in other fraudulent conduct as described in the Complaint.

13. The pain clinics and other medical practices that Relators believe are involved (or have been involved) in the kickback scheme with Physicians Choice Laboratory Services, LLC, ("PCLS"), include:

(a) **Complete Family Care.** Current name: **CFC-Knoxville (AJS-1), PLLC, d/b/a Complete Family Care, PLLC,** (<u>and its predecessors</u>) located at 8861 Kingston Pike, Knoxville, TN 37923. Owners: Fran (Pachinger) Incandela and Dr. Andrew Sugantharaj. The Articles of Organization for CFC-Knoxville (AJS-1), PLLC, were filed on 05/31/12, and the Annual Report lists Andrew Sugantharaj as a member. "Complete Family Care" has operated out of this address for many years (and for at least the last four years), so the business entity may have changed, but the owners have remained consistent for the last several years. According to Relator, Elizabeth Merry, the owners are Fran (Pachinger) Incandela and Dr. Andrew Sugantharaj.

(b) **Southeast Spine & Pain Associates, LLC,** (<u>and its predecessors</u>) located at 900 East Woodland Avenue, Knoxville, TN 37917. Owners/Practice Managers: James D. Lord and Christie Lord a/k/a Christie M. Lasater, and/or their "management" company: Optimal Medical Management, LLC, located at 8908 Weaver Crossing Road, Apex,

10

NC 27502.   As stated above, Relators believe Douglas R. Smith (or his proxy) may also have an ownership interest directly or indirectly in this pain clinic.   Additionally, as stated herein, former "owners" include: Portia Hutchinson and Jean N. McGuire, III, M.D.   Its predecessor was **Advanced Pain Therapeutics of Knoxville, TN, LLC,** and after its acquisition, the new "owners" formed:   "Southeast Spine & Pain Associates, LLC.", and continued operations out of the old address.   This pain clinic was previously owned by Sonia Crews-Foster.   The clinic was purchased by Defendants, Douglas R. Smith, James D. Lord and Christie Lord a/k/a Christie M. Lasater in September of 2012 using Nurse Practitioner, Portia Spencer Hutchinson, as the proxy owner, as hereinafter explained, with $300,000.00 provided by Defendant, Douglas R. Smith (and/or one of his affiliated entities).   Thereafter, James D. Lord and Christie Lord had Dr. McGuire "acquire" Southeast Spine & Pain Associates, LLC, effective 01/03/13, but he also left.   It is Relator, J.D. Jenkins' understanding that the current "owners" are Larry Sims, P.A., and Tonya Ambler, N.P.

(c) **Specialists in Pain Management, P.C./Southern Pain Specialists, PLLC**, located at 2339 McCallie Avenue, Chattanooga, TN 37404.   The owner of Specialists in Pain Management, P.C. is Thomas P. Miller, M.D., and he is also listed on its 2013 Annual Report as President.   John E. Blake, III, M.D. is listed on its Annual Report as Secretary.   On July 19,

11

2013, Southern Pain Specialists, PLLC was merged into Specialists in Pain Management, P.C.

(d) **Bearden Healthcare Associates, P.C.**, located at 10321 Kingston Pike, Knoxville, TN 37922. On information and belief, the owners of Bearden Healthcare Associates, P.C., are Dr. Frank McNiel, M.D., Glenn D. Johnson, D.C., and Jerry Railey, D.C.

(e) **Vitality Centers, LLC/Vitality Physicians, P.A.** Vitality Centers, LLC is located at 8908 Weaver Crossing Road, Apex, NC 27502. Owners: James D. Lord and Christie Lord a/k/a Christie M. Lasater. It is Relator, J.D. Jenkins' understanding that Douglas R. Smith was an owner in this, perhaps indirectly. James D. Lord claimed in a recorded conversation with Relator, J.D. Jenkins, on May 7, 2013 that he and his wife, Christie no longer were owners, and that Attorney, Avery Spence Chapman's wife is now President. Avery Chapman is Doug Smith's long-time attorney and Chapman's name appears on many of the LLC's and on Douglas R. Smith's trust referred to herein. Vitality Physicians, P.A., is located at 300 Billingsley Road, Suite 204, Charlotte, NC 28211.

(f) **Metrolina Pain Clinic, P.A.**, 6300 East Independence Boulevard, Suite B, Charlotte, NC 28212. This was owned by Defendant, Douglas R. Smith's father, but Relator J.D. Jenkins believes that Douglas R. Smith may be an owner, directly or indirectly, as well.

(g) **Greater Knoxville Medical Center, LLC,** 417 Holly Street,

12

Knoxville, TN 37917.   This clinic's Articles of Organization were filed on 09/26/11, and was allegedly managed by John Dawson.   It is the Relator, Elizabeth Coyle's understanding that this clinic was closed as a result of action taken by Federal investigators.   This LLC was administratively dissolved by the State of Tennessee on 08/13/13 for failure to file its Annual Report.

14.   As stated herein, the Relators have reason to believe that the kickback scheme, as described herein, concerning PCLS involves other pain clinics (and other medical practices) as PCLS currently asserts it has "clients" in thirty-nine (39) states, and the scheme has proven highly lucrative.   PCLS also has undergone astronomical growth since it was originally opened four (4) years ago.   It has plans for further aggressive growth, and as alleged herein, it appears the owners have taken steps to try to protect their assets in preparation for the time when their fraudulent activities are exposed, and/or to attempt to disguise/hide their ownership.

15.   In addition to the participation in the kickback scheme, as alleged herein, the Relators also have knowledge of other fraudulent practices committed by Complete Family Care and Advanced Pain Therapeutics of Knoxville, TN, LLC/Southeast Spine & Pain Associates, LLC, which include overutilization of in-house labs, overutilization of confirmation labs and other labs, overutilization of psychological "self-tests", upcoding, charging for medical care provided by unlicensed personnel, and unlicensed personnel writing prescriptions.   Given this commonality of fraudulent conduct, the Relators believe similar fraudulent overutilization has occurred (and is occurring) at the other medical practices who have been identified herein (and/or at other medical practices that will be identified during the investigation arising out of the Complaint as

13

participating in the kickback scheme).

16. On behalf of the United States, Relators, J.D. Jenkins, Elizabeth Coyle, and Elizabeth Merry seek through this action to recover damages and civil penalties arising from Defendants' false and fraudulent practices on behalf of the United States and the State of Tennessee.

17. Many of the acts alleged herein occurred in the Eastern District of Tennessee, including Knoxville, Tennessee.

## VI.    BACKGROUND

**A.    The Opioid Epidemic In America And The Increased Cost To Medicare, To Other Governmental Payors, And to Society As A Result Of Drug Abuse.**

18. Opioid addiction is an over increasing problem in the United States.   The Federal government and State governments spend billions of dollars annually directly or indirectly for pain treatment or for treatment for addiction.

19. While there are many legitimate physicians and companies involved directly or indirectly in pain management and/or in treatment for addiction, some corrupt physicians, professionals, individuals and companies have sought to cash in on the lucrative opioid addiction market by engaging in fraudulent conduct and by paying kickbacks to induce referrals or accepting kickbacks for making referrals as hereinafter described, at the cost of untold millions to taxpayers and an astronomical societal cost.

20. As the Office of Inspector General (OIG) has stated in a recent report:

> Prescription drug abuse is a serious and growing problem.   The Centers for Disease Control and Prevention (CDC) has characterized prescription drug abuse as an epidemic.   In 2010, approximately 7 million people in the United States were misusing prescription drugs.   Moreover, overdoses of

prescription painkillers—called opioids—are among the leading causes of accidental death in the United States.

With the rise in prescription drug abuse, concerns about Medicare fraud, particularly prescriber fraud, have increased. (Prescribers with Questionable Patterns in Medicare Part D (OIG-02-09-00603), 06-20-2013.

The OIG also stated:

A total of 1.1 million prescribers ordered Part D drugs for Medicare beneficiaries in 2009. These prescribers included many specialties, such as general-care physicians, dentists, and nurse practitioners. These individuals ordered over 1 billion prescriptions during the year. In total, Medicare paid $70.7 billion for these prescriptions. [Footnotes omitted].

21. The Governmental Accounting Office (GAO) touched on some of the societal costs associated with prescription drug abuse:

Prescription drug abuse is a national problem and appears to exist in the Medicare Part D program. In addition to the costs to society of addiction, overdose, death, and related criminal activities, taxpayers and Medicare beneficiaries bear the additional costs for excessive prescriptions obtained to supply an addiction or for diversion to illicit drug distributors. (Questionable Access to Prescription Drugs, GAO-11-699, Sept. 2011).

22. The Centers for Medicare & Medicaid Services (CMS) has discussed some of the additional costs associated with drug abuse/drug diversion in the context of the increased costs to Medicaid:

"…[A]ccording to the 2010 National Drug Threat Assessment report, "The threat posed by the diversion and abuse of controlled prescription drugs (CPDs), primarily pain relievers, is increasing, as evidenced by the sharp rise in the percentage (4.6 percent in 2007, 9.8 percent in 2009) of state and local law enforcement agencies reporting CPDs as the greatest drug threat in their area." Increased abuse of CPDs has led to elevated numbers of deaths related to prescription opioids, which increased 98 percent from 2002 to 2006.

The National Drug Threat Assessment report further states that, "The most commonly diverted CPDs are opioid pain relievers, according to Drug Enforcement Administration (DEA) and the National Survey of Drug Use

15

and Health (NSDUH) data." Opioid pain relievers are popular among drug abusers because of the euphoria they induce.

...

The impact of drug diversion on the Medicaid program goes beyond just the cost of the prescription drugs. There are also the costs associated with doctor's visits, emergency department (ED) treatment, rehabilitation centers, and other health care needs, not to mention the human toll. In 2008, the Drug Abuse Warning Network (DAWN), operated by the Substance Abuse and Mental Health Services Administration (SAMHSA), estimated that prescription or over-the-counter drugs used non-medically were involved in 1.0 million ED visits. Among the legal drugs, the most common drug categories involved were drugs acting on the central nervous system, especially opioid painkillers and psychotherapeutic drugs (especially sedatives and antidepressants). Opioid painkillers were associated with approximately 306,000 visits and benzodiazepines with 272,000 visits...."

(CMS, Drug Diversion in the Medicaid Program: State Strategies for Reducing Drug Diversion in Medicaid, January, 2012, pp. 1-2).

23.     Tennessee was identified as the second most medicated state in the U.S. as identified in a 2010 report released by Forbes.    Nationwide, the most commonly prescribed drug was the pain reliever Hydrocodone/APAP.

24.     The growing use and abuse of opioid medications has proven a boon to laboratories:

"As doctors try to ensure their patients do not abuse prescription drugs, they are relying more and more on sophisticated urine-screening tests to learn which drugs patients are taking and – just as important – which ones they're not.

The result has been a boom in profits for diagnostic testing laboratories that offer the tests.  In 2013, sales at such companies are expected to reach $2 billion, up from $800 million in 1990, according to the Frost & Sullivan consulting firm.

The growing use of urine tests has mirrored the rise in prescriptions for narcotic painkillers, or opioids.  But the tests, like earlier efforts to monitor opioid prescribing, have led to a host of vexing questions about

16

what doctors should do with the information they obtain, about the accuracy of urine screens and about whether some companies and doctors are financially exploiting the testing boom. [The New York Times Business Day, *"Increase in Urine Testing Raises Ethical Questions"*, published August 1, 2013.]

25. A central figure in the kickback scheme identified herein is Douglas R. Smith, "M.D.", who had operated one or more pain clinics in Florida until his medical license was revoked in 2009. It is believed that Smith and some of the other Defendants, such as Shaun Thompson, also have backgrounds as owners/operators/managers of pain clinics. These conspirators have sought new ways of cashing in on the opioid market indirectly through PCLS. Additionally, it is believed, as stated herein, that Douglas R. Smith may be the financier and/or shadow owner of other pain clinics, such as Advanced Pain Therapeutics of Knoxville, TN, LLC/Southeast Spine and Pain Associates, LLC, and perhaps others.

## VII. THE RELATORS

**A.    Relator, James D. Jenkins ("J.D. Jenkins").**

26. The Relator, James Dillion Jenkins, resides at 1709 North Hills Blvd., Knoxville, TN 37917. His social security number is 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. He was born on 11-24-1961 in Knoxville, Tennessee.

27. The Relator, J.D. Jenkins graduated from Farragut high school in Knoxville, TN. He thereafter attended the University of Tennessee in Knoxville, studying business and insurance.

28. The Relator's career since 1999 has largely been tied to the medical field.

29. The Relator has a consulting services company called Complete Solutions, LLC, which he has operated since 2011. Current clients are in medical/healthcare, financial services, logistics and consumer services. Complete Solutions is a consulting and services firm which

17

discretely counsels clients to assist in obtaining exponential business growth and profitability from efficient operations.

30.     In December of 2012, the Relator, J.D. Jenkins was approached by the Defendants, Christie Lord and James D. Lord of Optimal Medical Management, LLC, about managing a pain clinic in Knoxville, Tennessee - Southeast Spine & Pain Associates, LLC.   After discussions, the Relator, J.D. Jenkins was hired effective December 1, 2012 as the "Vice President" and "Executive Director" of Optimal Medical Management, LLC, to serve as the "exclusive manager" of "Southeast Spine And Pain" at the "Practice Site".   He was also appointed "Vice President and Executive Director" of Southeast Spine & Pain Associates, LLC.   Southeast Spine & Pain Associates, LLC is located at 900 E. Woodland Avenue, Knoxville, TN 37917-4511.   The "Medical Practice Management Services Agreement" is dated December 1, 2012 and is with both Optimal Medical Management, LLC, a North Carolina limited liability company, and with Southeast Spine & Pain, LLC, a Tennessee limited liability company.

31.     During his employment with Optimal Medical Management, LLC/Southeast Spine & Pain Associates, LLC, the Relator, J.D. Jenkins reported to James D. Lord and Christie Lord of Optimal Medical Management, LLC.

32.     During his employment with Optimal Medical Management, LLC/Southeast Spine & Pain Associates, LLC, the Relator, J.D. Jenkins received three (3) paychecks from Southeast Spine & Pain Associates, LLC, with the remainder of his paychecks coming from Optimal Medical Management, LLC.

33.     The Relator, J.D. Jenkins continued working in the position of "Vice President and Executive Director" of Southeast Spine & Pain Associates, LLC, until he was terminated by

18

Defendants, James D. Lord and Christie Lord a/k/a Christie M. Lasater, on May 13, 2013.

34.     The Separation Notice he received was signed by Christie Lord "Member of LLC" of Optimal Medical Management, LLC on 05/16/13.   It indicated he was discharged and the reason was "violation of Employment Contract".

35.     The falling out between the Relator, J.D. Jenkins and the Lords occurred over a period of time as the Relator, J.D. Jenkins discovered and objected to and unsuccessfully attempted to change some of the fraudulent practices hereinafter alleged.   Additionally, the Relator, J.D. Jenkins, was concerned about the Lords, via their "management company", pulling money out of the medical practice to the point where the medical practice could not pay bills, and there was discussion with Dr. McGuire, the then current "owner", who was the medical doctor at the practice, about severing his ties with the Lords.   These issues are discussed during the termination meeting, as was the overutilization issue which is hereinafter discussed.

36.     Following the Relator, J.D. Jenkins' termination, Dr. McGuire did attempt to sever ties with the Defendants, James D. Lord and Christie Lord a/k/a Christie M. Lasater, and their "management" company, Optimal Medical Management, LLC.   Defendant, Dr. McGuire thereafter on June 7, 2013, asked the Relator, J.D. Jenkins, to come back on Monday, June 10 2013, and manage the practice in the "appropriate manner".   The Relator, J.D. Jenkins agreed to do so, and the Relator, J.D. Jenkins went to Southeast Spine & Pain Associates, LLC on Monday, June 10, 2013 to begin managing the practice for Defendant, Dr. McGuire.   At about 11:30 a.m., the Defendants, James D. Lord and Christie Lord a/k/a Christie M. Lasater, showed up at the medical practice with two city police officers, and stated that the lease to the property had been put into their names and they showed the lease.   The lease had previously been month to month,

19

because there was a discussion about possibly moving the practice to a new location. The Relator, J.D. Jenkins, was asked to leave the premises, and he complied and left the premises.

37. The Relator, J.D. Jenkins saved a series of text messages going back and forth between Dr. McGuire and the Relator, J.D. Jenkins, concerning the Relator, J.D. Jenkins, coming back to the practice and the aftermath.

38. The Relator, J.D. Jenkins' Agreement with Optimal Medical Management, LLC, and Southeast Spine & Pain Associates, LLC, provided either party could terminate the agreement upon giving one hundred and twenty (120) days notice, and thereafter, the Relator, J.D. Jenkins, would continue to be paid for ninety (90) days following termination. However, when Relator was terminated, he received no such notice and received no such payment thereafter, and therefore, Optimal Medical Management, LLC, and Southeast Spine & Pain Associates, LLC, breached the contract.

39. The Relator, J.D. Jenkins received a letter following his termination, dated May 17, 2013 from Christie Lord, enclosing a proposed Severance Agreement and Release offering him $25,000.00.

40. The Relator, J.D. Jenkins refused to sign the Severance Agreement and Release by letter dated June 17, 2013 and a follow-up letter on June 28, 2013.

41. The Relator, J.D. Jenkins, received a threatening letter from the Lords and Optimal Medical Management, LLC's attorney dated June 28, 2013 to which the Relator, J.D. Jenkins replied by letter dated July 2, 2013.

42. Thereafter, the Relator, J.D. Jenkins received a threatening certified letter signed by the Defendants, James D. Lord and Christie L. Lord dated July 11, 2013.

20

B.    **Relator, Elizabeth Coyle.**

43.    The Relator, Elizabeth Coyle, currently resides at 1212 Queen Avenue, Number 2, Louisville, KY 40215.   She is originally from Louisville, Kentucky.   Her date of birth is October 23, 1986, and she was born in Louisville, Kentucky.   Her social security number is 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.

44.    The Relator, Elizabeth Coyle, has a two (2) year Associates Degree she obtained from Daymar College in Louisville, Kentucky.   The Associates Degree is in Clinical Medical Assisting.   She graduated from St. Francis High School in Louisville, Kentucky in May of 2005.

45.    The Relator, Elizabeth Coyle, originally came to Tennessee in June of 2011, to be with her boyfriend and she moved back to Louisville, Kentucky in or about April of 2013.

46.    The Relator, Elizabeth Coyle, got a job beginning in September of 2011 at New Phase Research and Development as a Clinical Research Coordinator and she was assigned to do research at Complete Family Care, PLLC, located at 8861 Kingston Pike, Knoxville, TN 37923 where she had an office.   As an employee of New Phase Research and Development, she reported to the owner of New Phase Research and Development, Sarah Carroll.   New Phase Research and Development's office is located at 5900 Walden Drive, Knoxville, TN 37919.   During Relator, Elizabeth Coyle's employment with New Phase Research and Development, they had clinical coordinators at five (5) other medical offices performing drug research.   This research is through pharmaceutical companies and involves human trials.

47.    While she was at Complete Family Care, PLLC, the Relator, Elizabeth Coyle, coordinated drug research on diabetes medicine, asthma medicine, and IBS medicine.   The patients who were involved in the research would typically stay on the medication for three (3) to six (6) months, and the Relator, Elizabeth Coyle, would oversee the research.   The doctor at

21

Complete Family Care was supposed to oversee her. The research patients signed consent forms, and they received a payment as well.

48.     During her employment for New Phase Research and Development, the Relator, Elizabeth Coyle, oversaw drug research on approximately fifteen (15) Complete Family Care patients. It was when she was initially looking for diabetes patients as potential participants in the research, that the Relator, Elizabeth Coyle, discovered the upcoding at Complete Family Care, PLLC, as hereinafter described.

49.     Ultimately, the Relator, Elizabeth Coyle, got fired on June 9, 2012 because Tessa Gaugreaux, an employee of Physicians Choice Laboratory Services, LLC, who was also stationed on site at Complete Family Care, PLLC, had made a posting on Craig's List concerning fraud and illegal activity at Complete Family Care, PLLC, including billing patients as Type II diabetics when they weren't diabetic. Since Relator, Elizabeth Coyle, was the one (1) that originally discovered the billing fraud involving the Type II diabetics and brought it to Fran (Pachinger) Incandela's attention, Fran (Pachinger) Incandela, thought Relator, Elizabeth Coyle, had made the posting on Craig's List, and she was angry. Fran (Pachinger) Incandela is one of the owners of Complete Family Care and the Office Manager.

50.     After Fran (Pachinger) Incandela became aware of the Craig's List posting, she called the Relator, Elizabeth Coyle's boss, Sarah Carroll at New Phase Research and Development. The Relator, Elizabeth Coyle, was confronted and the Relator, Elizabeth Coyle, was able to prove to her boss that she had nothing to do with the posting because she had text messages on her phone to and from Tessa Gaugreaux. Fran (Pachinger) Incandela tried to take the Relator, Elizabeth Coyle's phone to learn who had made the posting, so the Relator, Elizabeth Coyle, cleared the

22

memory out of the phone because she wanted to protect Tessa Gaugreaux. Fran (Pachinger) Incandela demanded that Relator, Elizabeth Coyle, either lose her job or hand her phone over. The Relator, Elizabeth Coyle, had previously shown the text messages to her boss, Sarah Carroll, but Fran (Pachinger) Incandella alleged that Relator, Elizabeth Coyle, had responded to Craig's List ads with Relator's name and telephone number, which she had not. Fran (Pachinger) Incandella indicated to Relator, Elizabeth Coyle's boss, Sarah Carroll, that she wanted Relator "out of the office", and Ms. Carroll had no other place to place her so Relator, Elizabeth Coyle, was terminated. Her last day of work at Complete Family Care was June 9, 2012. The Relator, Elizabeth Coyle, was paid through June 15, 2012.

51. The Relator, Elizabeth Coyle, does not believe that Sarah Carroll or New Phase Research and Development were involved in any of the fraudulent activity as herein alleged.

52. Relator, Elizabeth Coyle, began temping at Greater Knoxville Medical Center, LLC, in or about January of 2012 while she was still working for Complete Family Care. After she left Complete Family Care in June of 2012, she was hired full-time by Greater Knoxville Medical Center in September of 2012. She worked there full-time until December of 2012 when the practice was raided by the Feds. After the practice was raided, it was shut down and the Relator, Elizabeth Coyle, was out of a job. While working at Greater Knoxville Medical Center, LLC, she learned that they were also involved in the kickback scheme as herein alleged.

C.  **Relator, Elizabeth Merry.**

53. The Relator, Elizabeth Merry, currently resides at 1906 Goff Road, Knoxville, TN 37920. Her date of birth is December 27, 1966, and she was born in Perry, Florida. Her social security number is 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.

54. The Relator, Elizabeth Merry, has a GED and she had an EMT license from North Carolina which expired. She has lived in Knoxville, Tennessee since 2006. Before that, she lived in Ten Mile which is in Meigs County, Tennessee.

55. The Relator, Elizabeth Merry is a former employee of Complete Family Care, PLLC. She was originally hired by Complete Family Care, PLLC, in August of 2009 to work in the front office as Receptionist, and she remained as the Receptionist until January 10, 2013 when she voluntarily quit.

56. During her employment with Complete Family Care, PLLC, the Relator, Elizabeth Merry, worked approximately fifty (50) to fifty-five (55) hours a week and she reported to Fran (Pachinger) Incandela who was the Office Manager and one (1) of the owners. As stated herein, the other owner of Complete Family Care, PLLC, is Dr. Andrew Sugantharaj.

## VIII.  SOURCE OF RELATORS' ALLEGATIONS

57. Relators state that all allegations herein are based on evidence obtained directly by Relators independently and through their own labor and efforts. Relators are, therefore, an original source of information within the meaning of the False Claims Act, 31 U.S.C. § 3730(e)(4)(B). See, e.g., U.S. ex rel. Devlin v. State of California, 84 F.3d 358, 360-361 (9th Cir. 1996); U.S. ex rel. Springfield Terminal Railway Co. v. Quinn, 14 F.3d 645, 656-657 (D.C. Cir. 1994).

## IX.  THE DEFENDANTS

## I.  Defendant, Physicians Choice Laboratory Services, LLC ("PCLS")

58. Physicians Choice Laboratory Services, LLC ("PCLS"), is a Florida limited liability company with its principal address located at 300 Westinghouse Boulevard, Charlotte, NC 28273.

24

Its Registered Agent, Philip McHugh, is located at 300 Westinghouse Boulevard, Charlotte, NC 28273.

59. PCLS was originally incorporated on January 7, 2009 with its principal office at 766 SE 5th Avenue, Delray Beach, FL 33483. Its original "managing members" were Douglas Smith, 766 SE 5th Avenue, Delray Beach, FL 33483, and Philip McHugh, 1313 SW 20th Street, Fort Lauderdale, FL 33315.

60. Physicians Choice Laboratory Services, LLC, according to the CFO, Paul Schmidt, "offers screening for pain killers and opiates".

61. Physicians Choice Laboratory Service, LLC's NPI number is 1225278906 and its CLIA number is 34D1092392.

62. According to an article in Greater Charlotte Biz, the "founders" of Physicians Choice Laboratory Services, LLC, were "software developers", Philip McHugh, Jr., Marcus Sowinski, and Doug Smith:

> "…When Philip McHugh, Jr. first set out with software developers Marcus Sowinski and Doug Smith, their goal was to create a company that would help laboratories improve their efficiency and their relationships with the doctors they served. They had no intention of starting a lab themselves, but rather to subcontract with laboratory partners.
> …
> 'After six to nine months of working that way, we made the decision to open our own lab.'
> …
> 'The 10- to 20-fold increase in business early on was a big deal,' adds Roth (Mark Roth, Vice President of Operations). 'We definitely had to learn on our feet, but it helped us understand where we needed to be in terms of reporting and customer service.'
> …
> The company's accelerated growth is attributable in large part to the advent of more powerful prescription drugs whose metabolic effects are not fully understood, and also to an increase in their abuse.
> …

25

'There is a heightened need for testing to make sure people who aren't supposed to be on drugs, aren't in fact on drugs,' says Roth, 'as well as to measure some of the unknowns about how the body is metabolizing these powerful drugs.'…"

This article identifies Brent Dixon, Ph.D. as "Chief Scientist", <u>Joe Wiegel, President of Operations</u>, and Mark Roth, Vice President of Operations. The article also specifies: "**Principals:**" <u>Philip McHugh, Jr.</u>, <u>Co-founder</u>, President and Chief Creativity Officer: <u>Joe Wiegel</u>, <u>Co-founder</u>, President of Operations: Mark Roth, Vice President of Operations, **Employees:** 220, **Established:** 2009.

63. After Relator, J.D. Jenkins was hired by Optimal Medical Management, LLC, and Southeast Spine & Pain Associates, LLC, he was asked to go to Charlotte, North Carolina to a meeting at the Ritz Carlton. At the meeting, James D. Lord introduced Douglas Smith as the "owner" of PCLS. During the meeting, James Lord made it clear that Douglas Smith was the money behind all their operations, and he was the number one guy controlling/running everything, and that he does it through his attorney, Avery Chapman.

64. On April 13, 2009, Douglas Smith signed an Amendment to the Articles of Organization for PCLS adding Marcus Sowinski, 766 SE 5th Street, Delray Beach, FL 33483 as an additional "managing member". <u>Douglas R. Smith and Marcus Sowinski were previously involved in a Florida limited liability company with the name S2C2, LLC</u>. Its principal address was Mr. Smith's former home address: 1010 Bucida Road, Delray Beach, Florida 33483. It was created 01/18/08. The Operating Manager was Douglas R. Smith and the Vice-Operating Manager was Marcus Sowinski. [Marcus Sowinski resigned as manager and secretary on 03/16/10].

65.     On May 27, 2009, PCLS submitted Amended and Restated Articles of Organization to the Florida Secretary of State removing Douglas Smith[2] as a managing member and naming Philip McHugh, 1313 SW 20th Street, Fort Lauderdale, FL 33315 and Marcus Sowinski, 3035 SW 1st Avenue #504, Miami, FL 33129 as the "managers" of PCLS.

66.     On 03/29/10, Philip McHugh, CEO, submitted an annual report to the Florida Secretary of State, changing the mailing address of PCLS from 766 SE 5th Avenue, Delray Beach, FL 33483[3] to 12345 Steele Creek Road, Charlotte, NC 28273.

67.     On November 30, 2010, Marcus Sowinski signed Articles of Amendment for the Florida Secretary of State, changing his address as a managing member of PCLS from 3035 SW 1st Avenue, Apt. 504, Miami, FL 33129, to 327 SW 27 Road, Miami, FL 22129 [*sic,* should be 33129].

68.     On May 23, 2011, the Florida Secretary of State was advised that the mailing address of PCLS had changed from 12345 Steele Road, Charlotte, NC 28273 to 300 Westinghouse Boulevard, Charlotte, NC 28273.

69.     On April 10, 2012, Joseph Wiegel, as "President" of PCLS, signed the 2012 North Carolina Annual Report for PCLS listing Marcus Sowinski, Joe Wiegel, and Philip McHugh, Jr. as "managers".

70.     On March 2, 2013, the Annual Report of PCLS listed Philip McHugh, 222 East Bland Street, Apt. 163, Charlotte, NC 28203, U.S., and Joseph Wiegel, 14260 Middleham Lane,

---

[2] This is during the same time the then "Dr." Douglas Smith's name was in the news because his medical license was in jeopardy with the Florida Board of Medicine because he was facing his third pain killer-related violation in 18 months.

[3] This was the former address of Douglas Smith's pain practice, Coastal Pain Management, PA, before "Dr." Smith's medical license was revoked, and it is the address of several others of Mr. Smith's businesses and the address of his trust.   The address appears to have only one stand-alone building, at least as of the date of the attached Google Earth photo.

Jacksonville, FL 32223, U.S., as the "managing members". These same two (2) managing members were listed again on the Annual Report submitted April 29, 2013.

71.     Defendant, Philip McHugh, Jr., Defendant, Marcus Sowinski, and Defendant Joe Wiegel are named as Defendants based on their stated involvement in PCLS.

72.     Physicians Choice Laboratory Services, LLC, relocated from Charlotte, North Carolina to Rock Hill, South Carolina in 2013. The Relators don't know what motivated this move, but it may have been the incentives they were able to negotiate in connection with the laboratory they built. According to an article in the Charlotte Observer prior to the move to Rock Hill:

> Posted Thursday, Oct. 25, 2012
> Lab to hire 200; move to Rock Hill from Charlotte
>
> A toxicology laboratory is relocating from Charlotte to Rock Hill and increasing its workforce by 200 jobs.
>
> Physicians Choice laboratory Services announced Tuesday it is investing $24.1 million in a new building in the Riverwalk Business Park in Rock Hill, off U.S. 21.
>
> • • •
>
> Physicians Choice Laboratory Services is currently working out of eight different buildings off Westinghouse Boulevard in Charlotte, said Paul Schmidt, the company's chief financial officer. It employs about 150 people.
>
> The company expects its workers will make the move to a new 100,000-square-foot building at Riverwalk. The new facility is expected to be in operation by July, but company officials hope to open sooner.
>
> Overall, the company has committed to South Carolina that it will increase its workforce to 364 employees within five years.

28

The lab is the first company to build in the Riverwalk Business Park, site of the former Celanese Corp. textile plant.   The lab, the county and the state are sharing in the cost of building a new access road from North Cherry Road to the site.

The site means Physicians Choice Laboratory Services is eligible for federal "textile mill tax credits," which could reduce the company's cost of construction by up to 25 percent.

Other incentives include a fee-in-lieu-of-tax agreement with York County Council that will reduce the company's property tax by 43 percent for 20 years.   South Carolina's Coordinating Council for Economic Development also approved job development credits, once hiring targets are met.

Physicians choice Laboratory Services offers screening for painkillers and opiates, Schmidt said.   The company opened in Charlotte in 2009 and has seen "steady growth," he said.

73.     On 07/08/13, Physicians Choice Laboratory Services, LLC, had a ribbon cutting ceremony at its new facility located in Riverwalk Business Park in Rock Hill, South Carolina with guest of honor, South Carolina Governor, Nikki Haley.

74.     Largely fueled by the kickback scheme herein described, Physicians Choice Laboratory Services, LLC, has undergone astronomical growth:

> "In just four years, PCLS has transformed from just three employees and 400-square-foot office to 220 employees and a brand new $24 million 104,000-square-foot facility modeled after the Mayo Clinic Laboratory.   Previously spread among seven office buildings in south Charlotte, the entire company is now based in Rock Hill, S.C., and is the first occupant in the city's Riverwalk Business Park.
>
> We are well ahead of our growth pace," says Wiegel of PCLS' plans to have 364 employees by 2017."

75.     Physicians Choice Laboratory Services, LLC, brags that it has "clients in 39 states".

PCLS asserts it "meets and exceeds the requirements of the Centers for Medicaid and Medicare Services (CMS) and the Clinical Laboratory Improvement Amendments (CLIA)".

29

76.     In the Greater Charlotte Biz, September 2013 article, Physicians Choice Laboratory Services, LLC, explains its philosophy and its frustration with "bureaucracy" when it comes to "how to pay for certain services" and its willingness to push the envelope when it comes to its ambitious and aggressive desire to continue to expand:

> "Committed to staying ahead of the curve on testing, PCLS sometimes faces science outpacing bureaucracy when it comes to how to pay for certain services and how to handle data sharing.
>
> 'Science is moving on a high speed rail and bureaucracy is on a horse and buggy', says Wiegel. 'We hope that we're reaching a tipping point where there's enough knowledge in the marketplace on the side of the doctor and the side of the patient that demands will start requiring bureaucracy to be faster.'"

PCLS's frustration about "bureaucracy" may explain in part its rationalization for providing kickbacks to fuel its rapid growth. PCLS could try to rationalize the "kickbacks" it provides, in part, as "services it provides its clients":

> "As part of its path for continued growth and success, PCLS will continue to add more services for doctors as well as increase testing. This includes launching a Women's Health initiative and Cytology Branch later this fall to help curb prescription drug abuse in pregnant women."

77.     The "founders" and principals in PCLS, Philip McHugh, Jr., Marcus Sowinski, Doug Smith, and self-proclaimed partner, Joe Wiegel, have set up two (2) companies directly related to PCLS (using PCLS' address in North Carolina) that are owned by a combination of their various corporations, LLC's, and trusts, in an apparent attempt to try to safeguard their assets should the kickback/overutilization scheme be exposed. These various entities can also serve to disguise their individual involvement in the illegal scheme. Some of the companies they have set up appear directly related to PCLS:

30

- Among other businesses/entities, Defendant, Douglas R. Smith has a trust, "DRS 2011 Family Trust", that uses his attorney's address: Avery Chapman, 12008 South Shore Boulevard, Suite 107, Wellington, FL 33414. Smith also has Smith Clovis Capital Holdings, LLC, that also uses his attorney's address.

- Philip T. McHugh, Jr., has "Silent Storm Holdings, LLC", FEI/EIN Number 45-4577487. It was formed 03/11/11 with its principal address at Icon Tower II, 495 Brickell Avenue #1608, Miami, FL 33131. Its managing member is "P.T. McHugh". This LLC also uses the address 10725 S. Ocean Drive, Lot 296, Jensen Beach, FL 34957.

- Joe Wiegel has "DCW Family Holdings, LLC" and has designated his wife, Diane Wiegel, as the managing member. It designates its principal address as 14260 Middleham Lane, Jacksonville, FL 32223 (with its mailing address as 5859 Savona Terrace, Fort Mill, SC 29708). It was formed 11/17/09 and remains active. Joe Wiegel also has Novidea, Inc. with principal address as 14260 Middleham Lane, Jacksonville, FL 32223, with Joe Wiegel as President. This corporation was formed 04/29/03 and since 09/27/13 was listed as "inactive" – as the result of an administrative dissolution for failing to file its annual report.

- Marcus Sowinski has "It's A Project, LLC" which was formed on 01/16/07 and has as its principal address, 205 SW 21 Road, Miami, FL 33129. It designates its managing partner as Marcus Sowinski.

78. Smith, Wiegel, Sowinski, and McHugh designated Smith's trust and Wiegel's, Sowinski's, and McHugh's LLC's (identified in ¶77 above) as the "managing members" of

31

"Laboratory Equipment Holdings, LLC" that has the same address as Physicians Choice Laboratory Services, LLC ("PCLS") in Charlotte, North Carolina (300 Westinghouse Boulevard, Charlotte, North Carolina). Laboratory Equipment Holdings was formed 08/06/12, and it's registered agent is Attorney, Avery S. Chapman, Esq., 12008 South Shore Boulevard, Suite 107, Wellington, FL 33414. It appears that "Laboratory Equipment Holdings, LLC," may be one of the entities used to funnel kickbacks to the pain clinics/medical practices.

79. Smith, Wiegel, and McHugh also designated Smith's trust and Wiegel's and McHugh's LLC's (identified in ¶77 above) when they set up "Riverwalk Holdings of South Carolina, LLC," which is a Florida limited liability corporation with Avery S. Chapman, Attorney, as the registered agent that also uses the same address as PCLS (300 Westinghouse Boulevard, Charlotte, North Carolina). This was formed 08/16/12. (Note: The corporate papers for Riverwalk Holdings of South Carolina, LLC erroneously has "S.C." instead of "N.C."). PCLS's "$24.1 million dollar" building in South Carolina is located in "Riverwalk Business Park."

**II.     Defendant, Douglas R. Smith, "M.D."   (License revoked)**

80. Doug Randall Smith, "M.D.", is from Florida, but it is believed his current address is 1146 Crestbrooke Drive, Charlotte, North Carolina 28211. He is divorced.

81. Florida's License Verification Webpage indicates Douglas R. Smith originally received his medical license on June 22, 1992 (License Number ME62450), and the webpage also indicates a "license expiration date as January 31, 2011", but the License Verification indicates his license was "revoked." It states his "qualifications" are "Dispensing Practitioner". Douglas R. Smith's Practitioner Profile indicated he apparently once had privileges at Good Samaritan Hospital in West Palm Beach, Florida. It indicates he went to Bowman Grey School of Medicine

32

from January 1, 1982 to January 1, 1986. The Department of Health, Florida Board of Medicine minutes indicate Douglas R. Smith was disciplined multiple times for pain medicine related violations in 2007, 2008, and 2009, including his license revocation in December of 2009. As hereinafter alleged, Dr. Doug Randall Smith appears to have remained in the opioid industry after his medical license was revoked.

82.     Doug Randall Smith, M.D., operated one or more pain clinics in Florida, including Coastal Pain Management, P.A., FEI/EIN Number: 20-3202674, located at <u>766 S.E. 5th Avenue, Delray Beach, FL 33483</u>. Coastal Pain Management, P.A., was formed on 04/14/05 and was administratively dissolved on 09/24/10 for failure to file its Annual Report.

83.     At or about the time the Florida Medical Board was considering the revocation of Dr. Smith's medical license, it appears that Dr. Smith may have sold (or conveyed) his medical practice to <u>Dr. Fernando Jimenez</u> because on May 28, 2009, Dr. Jimenez formed Pain Management Care Consultants <u>and used Dr. Smith's 766 S.E. 5th Avenue, Delray Beach, FL 33483 address</u> until May 28, 2010, when Mr. Jimenez changed his address to 400 East Union Boulevard, Suite 6-3, Delray Beach, FL 33483. It is not known to Relators whether Douglas R. Smith maintained any business interest in the pain clinic or whether this clinic participated (or participates) in the kickback scheme described herein, but this should be determined.

84.     Dr. Smith's problems with the licensing board relating to his pain medication practices were well publicized. For example, an article appeared in the Sun Sentinel (Fort Lauderdale, Florida) on 06/06/09 when the medical board voted to revoke Dr. Smith's license:

06/06/2009     Sun Sentinel (Fort Lauderdale, Fla.)
                       "Pain Docs Hit With Severe Penalties"

33

Police and doctors say a growing number of unscrupulous pain clinics in South Florida make huge profits selling millions of pain pills a month, sometimes to drug dealers and addicts from all over the Southeast.

The board rejected settlement deals for the doctors.

First, the board voted to revoke the medical license of Delray Beach pain doctor Douglas R. Smith, who was facing his third painkiller-related violation in 18 months, state records show.

Smith in 2006 repeatedly prescribed a potentially deadly combination of up to 270 narcotic pills and 15 pain patches a month to an unnamed 49-year-old man, officials said in a complaint.

"No way we would let you walk out and do more pain management. You don't care," said board member Onelia Lage, a Miami doctor. "I don't want your next case to be a death."

Smith has seven days to accept the revocation or request a state hearing. He declined to comment except to say he did nothing wrong and no longer practices medicine.

Last year, Smith also was fined $20,000 for giving 240 pills to treat pain and anxiety to a first-time patient, 22, who was found dead the next day of an overdose, records show. ...

85.    Another article appeared as an online post for WSVN on June 16, 2009 by Carmel

on the Case:    Prescription for Trouble:

Florida's state medical board is coming down hard on doctors who give out large numbers of addictive pain pills. Seven News first exposed the Pill Mills, and now investigative reporter Carmel Cafiero has the latest.

WSVN --  Folks are still coming from other states to get pain pills in South Florida. Some to use, some to sell. It's a huge cash business, and there's so much money to be made, there are now close to 100 pain clinics in Broward County alone.

Young Mother:   "He just told me, I'll give you seven pills a day, how does that sound?"

34

This young mother asked that we protect her identity. She says she went to the pain clinic when her regular doctor refused to give her more pain pills after knee surgery.

Addict: "I just wanted relief from my pain."

What she got was addicted.

Dr. Fred Bierson: "This is the Florida Board of Medicine full board meeting."

And now the state Board of Medicine is sending a message to pain management doctors.

John Beebe: "People are dying from these kinds of issues."

At a recent meeting, three South Florida physicians were strongly disciplined after the Department of Health investigated how they dispensed pain pills.

Dr. Douglas Smith: "Wow, where to begin."

Dr. Douglas Smith of Delray Beach was accused by the state of over prescribing pain pills.

Dr. Douglas Smith: "Perhaps I'm just a little too easy to say yes and increase doses sometimes. I accept that."

According to the state, one of his patients died of an overdose.

Dr. Lisa Tucker: "People with legitimate pain are now having difficulty finding quality physicians because we're having to make guidelines because of people like you, and that's wrong. That is wrong, and you don't need to be practicing medicine anymore."

The board unanimously voted to revoke his license.

Carmel Cafiero: "Are you surprised?"

Dr. Douglas Smith: "Where's the restroom? Here's the restroom."…

35

86.     The Defendant, Doug Randall Smith, M.D., was also mentioned in an article that appeared in the Palm Beach Post on December 15, 2009 that discussed the pain pill epidemic in Florida and a patient that died of an overdose of "drugs Smith signed for":

12/15/2009   Post exclusive:   "Pill mills" popping up all over Palm Beach County

> Palm Beach Post
> By Michael LaForgia
> Staff Beach Post Staff Writer

Long after his third felony conviction, a onetime drug smuggler and gun-toting outlaw from Florida's cocaine cowboy days walked into a Delray Beach permitting office and made himself a bona fide pain manager.
Kent A. Murry's rap sheet showed 15 arrests on a wide variety of misdemeanor and felony charges, including a slew of drug collars amassed during a criminal career that spanned about 37 years.

None of that mattered when Murry, 57, dived into the pain clinic business, a multimillion-dollar industry fueled by junkies and drug dealers from Florida to Tennessee – and made perfectly legal by gaping loopholes in state law.

Murry was among a growing number of people profiting from pain clinics in Palm Beach County, where 16 or more pain management businesses have opened since February.   Records show at least 10 clinic owners previously opened medical offices in Miami-Dade or Broward, where a grand jury was empaneled to investigate clinics after the county was labeled the pain pill capital of the United States.

Reputable pain clinics serve a legitimate purpose.   But an increasing number of new clinics aren't operating with patients' best interests at heart, according to authorities and state medical officials.   Evidence that these clinics are spreading north has Palm Beach County leaders and law enforcement agencies increasingly alarmed.

"The growth has just been exponential in the county," said narcotics Lt. Dennis St. Cyr of the Palm Beach County Sheriff's Office.   "We're struggling to keep up with the numbers of pills on the street."

36

**...**

These physicians, too, increasingly are pushing north. Nearly half were registered to prescribe drugs in Broward or Miami-Dade before moving into Palm Beach County. Most came north within the last year or two, according to U.S. Drug Enforcement Administration records.

The surge in pain clinics here coincides with the passage this spring of a state law aimed at curtailing pill mills by tracking prescriptions in a database – a law that won't take effect until December 2010.

Between now and then, authorities say, there's plenty of money to be made.

"Like hitting the lottery."

**...**

Authorities say the pain clinic business is wildly lucrative. A suburban West Palm Beach pediatrician accused by sheriff's investigators of spending only part of his time prescribing pills deposited $120,186.24 a month into three bank accounts during the first half of 2008, court documents show.

"It's not unusual for these guys who manage these businesses and own these businesses to make tens of thousands to hundreds of thousands (of dollars) per week," St. Cyr said. "These guys opening these pain clinics – to them, it's like hitting the lottery."

Trouble with doctors

For the savvy operator, reaping staggering profits is easy as hiring the right doctor, investigators and state officials said.

Federal records suggest there's no shortage of willing candidates: At least 60 doctors are registered to prescribe drugs from pain clinics in Palm Beach County.

In April, one of these, Douglas Randall Smith, prescribed 120 oxycodone, 60 Xanax and 60 methadone tablets to a 22-year-old man on his first visit to Smith's Delray Beach office. A day after filling the prescriptions, the man was found dead, overdosed on the drugs Smith had signed for.

Smith's records indicate his examination of the new patient didn't go much further than banging his knees with a rubber hammer, state regulators found. He was

37

fined $10,000 and ordered to take drug and records courses and to complete 50 hours of community service.

DEA records show he is registered to prescribe drugs from a Delray Beach office until 2011, though state records say he voluntarily surrendered his medical license. A woman who answered the phone at the Delray Beach clinic said Smith didn't work there anymore.

•••

St. Cyr, the narcotics lieutenant, said the changes won't disrupt elaborate drug trafficking operations in the short term, enterprises that are pouring pills into the streets and creating a pipeline that stretches from South Florida to the Appalachian Mountains.

Intercepting just a portion of the drugs that originate in or pass through Palm Beach County, the sheriff's office has seized "tens of thousands of pills" bound for Kentucky, Tennessee and other states, St. Cyr said. Street recruits typically gather the drugs and then route them from one dealer to the next.

"Everybody gets rich," St. Cyr said, "and a good percentage of the people who end up with those pills at the end of the line are overdosing."

87.    It is Relator, J.D. Jenkins' understanding that Defendant, Douglas Randall Smith, "M.D." has created one or more trusts including "DRS 2011 Family Trust" that he uses to own various business interests.   This trust sometimes lists Smith's attorney's address, Avery Chapman, 12008 South Shore Boulevard, Suite 107, Wellington, FL 33414 on filings, and sometimes it uses the former address of Smith's Coastal Pain Management, PA, at 766 S.E. 5th Avenue, Delray Beach, FL 33483.   As previously stated, Smith also uses Smith Clovis Capital Holdings, LLC, which also uses his attorney's address, to "own" various business interests.

88.    Douglas R. Smith also has an active Florida limited liability company called "DRS Medical Office, LLC".   This was formed on 02/04/09 using Douglas Smith's Coastal Pain Management, PA's address of 766 SE 5th Avenue, Delray Beach, FL 33483 in which he is the

38

managing party. His attorney's law firm is the Registered Agent: Chapman Law Group, PLC, 12008 South Shore Boulevard, 107, Wellington, FL 33414, and effective 09/27/13, the law firm was designated as the managing member, and the law firm's address was made the "principal place of business".

89. Douglas R. Smith also apparently has another active Florida limited liability company: Destrier Consulting Service, LLC. It was created on 05/02/12 and also uses Smith's former Coastal Pain Management, PA, address: 766 SE 5th Avenue, Delray Beach, FL 33483. Its FEI/EIN number is 45-4392660. The Registered Agent is Smith's Attorney, Avery S. Chapman. The managing members were himself, Preston L. Smith (his son?) and Casey L. Cochran, all using the same 766 SE 5th Avenue, Delray Beach, FL address. However, on September 19, 2013, the Articles of Organization were amended to "remove" Douglas R. Smith as a managing member and adding: "Smith Destrier Holdings, LLC" as a managing member. The Florida Division of Corporations indicates Smith Destrier Holdings, LLC, was formed on 08/21/13 and it is active as of 10/30/13. Smith Destrier Holdings, LLC also uses Douglas Smith's Attorney's address: 12008 South Shore Boulevard, Suite 107, Wellington, FL 33414, and identifies his Attorney: Avery S. Chapman, as the "manager".

90. Douglas R. Smith also appears to have an interest in Scriptrx, Inc., which apparently is an active company. This is a Florida for profit corporation originally created 01/05/01 with the principal address: 312 Clematis Street, 301, West Palm Beach, FL 33401. Its FEI/EIN number is 522271639. "Doug Smith, M.D." wrote a letter to the Florida Division of Corporations on May 21, 2001 in which he stated in part:

39

We are a new company, incorporated on January 1, 2001, supported by venture capital and scrambling to develop and market our product before the monies run out.

...

What we are trying to accomplish at ScriptRx is to provide a machine to Hospitals and Doctor's offices that will produce accurate, easily read prescriptions.   We have had moderate success and struggle forward.

In a 2004 filing, Defendant, Shaun M. Thompson, was identified as a Vice President.   Doug Smith's name was removed as a director on May 1, 2003.

91.     The Defendant, Douglas R. Smith told Relator, J.D. Jenkins, he set up the trusts following his divorce.

92.     It is believed that Douglas R. Smith was divorced from Cynthia R. Smith in or about 2008.

93.     Douglas R. Smith apparently has provided funds to James D. Lord and Christie M. Lasater a/k/a Christie Lord, (and/or through their company, Optimal Medical Solutions, LLC.) to acquire at least one (1) pain clinic, Advanced Pain Therapeutics of Knoxville, TN, LLC, which later became Southeast Spine & Pain Associates, LLC.   The Relator was specifically told by Mark Bullock, Controller of Optimal Medical Management, LLC, in North Carolina that Dr. Douglas R. Smith had provided $300,000.00 so that James and Christie Lord could acquire that practice.   The Relator was told this on the phone in or about March of 2013.   Additionally, in a conversation that occurred on October 9, 2013 with the former owner of Advanced Pain Therapeutics of Knoxville, TN, LLC, (the pain clinic that became Southeast Spine & Pain Associates, LLC), Sonia Crews-Foster, the Relator, J.D. Jenkins, was informed that all the early discussions/negotiations involving the sale of her pain clinic, Advanced Pain Therapeutics of Knoxville, TN, LLC, were

40

conducted by Douglas R. Smith. Douglas R. Smith then later introduced Sonia Crews-Foster to James and Christie Lord.

94. The Relator, J.D. Jenkins, believes Douglas R. Smith is the owner, an owner, or otherwise has (or had) a business interest in: Physicians Choice Laboratory Services, LLC, ("PCLS"), Laboratory Equipment Holdings, LLC, Vitality Centers, LLC, Optimal Medical Management, LLC, Southeast Spine & Pain Associates, LLC, Medx Software, Inc., Medxsoftware Development, LLC, and Advanced Pain Therapeutics of Knoxville, TN, LLC.

95. Although Douglas R. Smith's name was removed as a "managing" member of Physicians Choice Laboratory Services ("PCLS") on May 27, 2009[4], the Relator, J.D. Jenkins, was told on several occasions in 2013 that Douglas R. Smith owned, owns, or is an owner of PCLS. For example, he was told by Douglas R. Smith at the meeting in Charlotte at the Ritz Carlton in January of 2013 that he had built "his lab", PCLS, from one machine on a concrete floor to where it is today. The following day, Douglas R. Smith told the Relator, J.D. Jenkins, he wanted to take him to see "his lab". Additionally, the first time the Relator, J.D. Jenkins, met Douglas R. Smith was in January 2013 in Charlotte, and Jim Lord introduced Douglas R. Smith as "the owner" of PCLS. Also, Douglas R. Smith introduced himself that way to the Relator, Elizabeth Merry.

96. Additionally, the Relator, J.D. Jenkins, called Physicians Choice Laboratory Services, LLC, in or about July of 2013, at the following phone number: (855) 725-7123, and asked to speak to "Dr. Doug Smith", and he was informed by the lady answering the phone: "He is not in right now", and she offered to take a message. The Relator, J.D. Jenkins, stated he would call back.

---

[4] About this same time, Marcus Sowinski was added as a managing member. Sowinski was a former business associate of Douglas R. Smith.

41

97.     On May 9, 2013, "Federal agents" raided Complete Family Care, LLC.   The Relator, J.D. Jenkins, was out of town, but he was advised by James Lord via telephone that Douglas Smith and Ian Clarke were at Complete Family Care the day it was raided.   A member of the Relator, J.D. Jenkins' staff, Donna Gibson, advised Relator, J.D. Jenkins, that Douglas Smith had come over to Southeast Spine & Pain, Associates, LLC, the same day after the raid, and when he arrived, he appeared shaken and he "huddled" with Jim and Christie Lord.   Ms. Gibson stated Doug Smith went into Jim and Christie Lord's office and they all met behind closed doors for an extended period of time before Doug Smith left the office.

98.     Douglas Smith also had (or has) an ownership interest in (or he otherwise controls) Medx Software, Inc., which is believed may be used in the kickback scheme to funnel consulting, computers, computer services, equipment, monitors, software, and furniture to medical clinics. For example, on one occasion, in or about March or April, 2013, Relator J.D. Jenkins, told Shaun Thompson they needed two (2) additional computers for the office, and Shaun Thompson told him that he would have to get it "approved by Doug Smith, so Avery Chapman will release the funds".

99.     The front persons for Medx Software, Inc. are Shaun Thompson and Ian Clarke and both of these men were seen by the Relators at different times at Advanced Pain Therapeutics of Knoxville, TN, LLC/Southeast Spine & Pain Associates, LLC, at Complete Family Care, LLC, and at Greater Knoxville Medical Center, LLC, from time-to-time as hereinafter described.   Also, as stated herein, these two men seem to be directed by Doug Smith.   In Relator, J.D. Jenkins' presence, Shaun Thompson on several occasions referred to Doug Smith as "Father".   On one occasion, Jim Lord told Shaun Thompson and Ian Clarke he needed them to take care of something

42

for him, and Shaun replied: "Not now, father has summoned us to Florida", referring to Doug Smith.

100. The Relator, J.D. Jenkins, retained a mailing label addressed to: "Medx/Doug Smith", using the address for Southeast Spine & Pain Associates, LLC, and giving Doug Smith's home address as the "Billing Address".

101. Doug Smith also appears to be the directing force behind a "consultant", Lou Fisher, who is allegedly a former pharmacist for the DEA. Mr. Fisher would go to various pain clinics, including Southeast Spine & Pain Associates, LLC. To Relator, J.D. Jenkins' knowledge, Lou Fisher was being sent to the clinics "free" of charge by Doug Smith as further stated herein. Mr. Fisher would conduct compliance reviews and advise clinics how to "stay out of trouble" and how to avoid scrutiny from "the Feds". On one occasion, Lou Fisher informed Relator, J.D. Jenkins, that he was using Doug Smith's credit cards to pay for his flights. He also told Relator, J.D. Jenkins, that he travels to various medical clinics at the direction of Doug Smith and/or Jim and Christie Lord.

### III. Defendant, Medx Software, Inc./Medxsoftware Development, LLC.

102. Medx Software, Inc.'s charter was originally filed with the Florida Secretary of State on 05/31/06, and it was thereafter revoked for failure to file its annual report on 09/24/10. Its principal address was listed as 3468 Canal Court, Tequesta, FL 33469. Its FEI/EIN number is 201331029. Its Annual Report signed on 04/22/09 listed its officers as:

- Doug Wolverton, 2250 SW 67th Way, Miramar, FL 33023.

- Shaun Thompson, 5582 Rambler Rose Way, West Palm Beach, FL 33415.

- Patricia Louko, 3468 Canal Court, Tequesta, FL 33469.

43

103.    Medx Software, Inc.'s Annual Report signed on 12/15/07 also listed James Maxwell, 1718 19th Avenue North, Lake Worth, FL 33460 as an Officer/Director.   It was originally incorporated in Delaware, and when it filed its application for authorization to conduct business in Florida, the stated purpose of the corporation was to "develop computer software for medical use/application", and Defendant, Shaun Thompson was listed as President & CEO.

104.    Doug Wolverton is a Defendant because he was/is an owner and officer in both Medx Software, Inc., and Medxsoftware Development, LLC.

105.    Medxsoftware Development, LLC is a Florida limited liability company formed June 11, 2013 with its principal address located at 766 NE 5th Avenue, Delray Beach, Florida 33483.   This address is associated with several of Doug Smith's businesses and former businesses, including his former medical practice.   The Relators believe that Doug Smith may have formed this company following the raid on Complete Family Care because as Shaun Thompson stated to Relator, J.D. Jenkins, previously:   Doug Smith had told him they could "get around it" by calling what they were doing as "software development".   Relator, J.D. Jenkins, took this as referring to getting around kickback problems.   This was in a meeting held after hours in the lobby at SSPA. In attendance at this meeting were Portia Hutchinson, Lou Fisher, Shaun Thompson, Doug Smith, Jim & Christie Lord, Ian Clarke, and 2 to 3 others, but Relator, J.D. Jenkins, cannot recall their names. Additionally, after the raid at Complete Family Care, Shaun Thompson was distressed and he told the Relator, J.D. Jenkins, that he could end up in jail because of something Avery Chapman did. Relator, J.D. Jenkins, took this as referring to the kickback scheme.

106.    The original managing members of Medxsoftware Development, LLC when the paperwork was signed on June 6, 2013 were:

44

- Doug Wolverton, 2250 SW 67th Way, Miramar, FL 33023

- Shaun Thompson, 5582 Rambler Rose Way, West Palm Beach, FL 33415

- DRS Family Trust, 766 SE 5th Avenue, Delray Beach, FL 33483.   (It is believed that this trust is Defendant, Doug Randall Smith's trust.   It uses the address of Douglas R. Smith's former pain clinic).

107.   On September 20, 2013, articles of amendment were filed with the Florida Secretary of State removing DRS Family Trust 2011 as a managing member of Medxsoftware Development, LLC.   This was signed by Smith's attorney, Avery S. Chapman, on September 7, 2013.

108.   Douglas Smith appears to be the controlling force behind Medx as previously indicated with respect to using his credit card to pay for the tables/cubicles for the computers in the lobby of Advanced Pain Therapeutics of Knoxville, TN, LLC/Southeast Spine & Pain Associates, LLC.   During a discussion with Shaun Thompson in March or April, 2013, the Relator, J.D. Jenkins, told Shaun Thompson they needed two (2) more computers, and Shaun Thompson stated he would have to get permission from Doug Smith and then Avery Chapman (Doug Smith's attorney) would fund them.

**IV.    Defendant, Shaun Thompson**

109.    It is believed the Defendant, Shaun Thompson currently resides at 5582 Rambler Rose Way, West Palm Beach, Florida 33415.   His cell phone number is (561) 420-5065.   Relator, J.D. Jenkins, is also aware that Shaun Thompson has a residence he shares with Ian Clarke in Knoxville, Tennessee near EuroHaus Motorsports.

45

110.    From time-to-time, Shaun Thompson has stated to Relator, J.D. Jenkins, he was a representative and owner of Medx and a salesman for PCLS.   Per Relator, Elizabeth Merry, Douglas Smith introduced Shaun Thompson as his "partner".

111.    Shaun Thompson was apparently previously a manager in Advance Pain & Wellness Centers, LLC, 8251 W. Broward Boulevard, Suite 501, Plantation, FL 33324.   The Articles of Organization was filed on 06/07/07 and was administratively dissolved on 09/26/08 for failure to file the annual report.   The other manager in this venture was identified as Steve Burack, D.O.   Steve Burack, D.O., is apparently practicing medicine in Florida and is currently located at 7725 San Mateo Drive/E, Boca Raton, FL 33433, Telephone: (561) 809-3778.   Given Dr. Burack's his past affiliation with Shaun Thompson, it should be determined whether he is receiving kickbacks and making referrals to PCLS.

112.    The Defendant, Shaun Thompson has a business relationship with Douglas R. Smith going back several years, and Mr. Thompson may have an ownership interest in one or more of Douglas R. Smith's businesses and may be a proxy owner for Douglas R. Smith in other businesses.

113.    On one (1) occasion, Shaun Thompson brought into Southeast Spine & Pain Associates, LLC, brochures for Physicians Choice Laboratory Services, LLC.   These brochures, in part, tried to explain why physicians would use PCLS, and it discussed their bills, and it had PCLS' phone number.

114.    Relator, Elizabeth Merry, has knowledge that Shaun Thompson also brought PCLS brochures to Complete Family Care.

115.    The Relators believe the Defendant, Shaun Thompson was the President, CEO, and an owner of Medx Software, Inc., and is an owner and/or manager of Medxsoftware Development,

LLC, located at <u>766 NE 5th Avenue, Delray Beach, Florida 33483</u>, but he may be a proxy owner for Douglas R. Smith. These are straw companies that were and are used to funnel kickbacks consisting of software, computers, equipment, furniture and consulting services to primarily pain practices in return for their agreement to make referrals to PCLS for laboratory services. It is the Relator, J.D. Jenkins' understanding that Douglas R. Smith or his trust, DRS 2011 Family Trust, is and/or were an owner of Medx Software, Inc., Medxsoftware Development, LLC, and PCLS.

116. Shaun Thompson is shown as a manager in Samira Thompson, LLC. This limited liability company in Florida has the principal place of business of 2009 Fuller Cross Road, Ocoee, FL 34761. It is shown as having an "active" status as of 10/29/13. Its FEI/EIN number is 45-4126376. The other manager is identified as "Samira Thompson" with the same address as is listed for Shaun Thompson and the company. Relators, Elizabeth Merry and Elizabeth Coyle, do not know if Samira Thompson is Shaun Thompson's wife, but are aware Shaun Thompson never wore a wedding ring, and he dated several women and it was their understanding that he was single, and he never said anything about being married.

**V.    Defendant, Complete Family Care, PLLC.**

117. CFC-Knoxville (AJS-1), PLLC, d/b/a Complete Family Care, LLC, is a Tennessee limited liability company with its principal address located at 8861 Kingston Pike, Knoxville, TN 37923, that was formed on May 31, 2012. It has the "Assumed Name" of Complete Family Care, PLLC. Its Registered Agent is Dr. Andrew Sugantharaj.

118. The Defendant, PA-Knoxville, (AJS-2), PLLC, d/b/a Pounds A Weigh, PLLC is a Tennessee limited liability company with its principal address located at 8861 Kingston Pike, Knoxville, TN 37923. It has the "Assumed Name" of Pounds A Weigh, PLLC.

47

119. The Relators, Elizabeth Coyle and Elizabeth Merry, are unsure of the exact name of the previous corporate entities for Complete Family Care, but Relator, Elizabeth Merry, had been working for "Complete Family Care" located at 8861 Kingston Pike, Knoxville, TN 37923, since August of 2009, and it was known as Complete Family Care at that time as well, and the owners of Complete Family Care remained consistent during that time: Dr. Andrew Sugantharaj and Fran (Pachinger) Incandela. They may have changed the corporate entity due to various court cases filed against Complete Family Care, PLLC.

120. CFC-Knoxville (AJS-1), PLLC, d/b/a Complete Family Care, LLC, previously also had an office in Maryville, Tennessee which was open just a couple of months from approximately May of 2011 to about July of 2011, and apparently, according to Relator, Elizabeth Merry, there was a lawsuit filed by a doctor in Maryville who they were supposed to pay a salary to, but they never did.

121. Complete Family Care of Knoxville is a certified pain management clinic in Tennessee (Facility License Number 00000066), and the Tennessee Department of Health lists Dr. Andrew Sugantharaj, M.D. as Medical Director.

122. As the Relators, Elizabeth Coyle and Elizabeth Merry understand, the current owners of CFC-Knoxville (AJS-1), PLLC, d/b/a Complete Family Care, LLC are Dr. Andrew Sugantharaj and Fran (Pachinger) Incandela.

123. CFC-Knoxville (AJS-1), PLLC, d/b/a Complete Family Care, LLC is a pain clinic and approximately 95% of the patients are pain patients.

124. As far as the patient mix, the Relators, Elizabeth Coyle and Elizabeth Merry, believe that approximately 70% of Complete Family Care's patients have Medicare or TennCare,

48

approximately 5% to 10% have private insurance, and approximately 20% are private pay. The clinic would normally see approximately fifty (50) to sixty-five (65) patients a day, five (5) days a week. Of these patients, approximately 100% would have in-house urine drug screens, and approximately 100% of these labs would be sent to PCLS for confirmation tests.

125.    As Relators, Elizabeth Coyle and Elizabeth Merry understand, a previous owner of Complete Family Care was Robert J. Pachinger, D.C., (Chiropractor). His wife at the time, Fran (Pachinger) Incandela, may have also been an owner with him. Robert J. Pachinger entered pleas to drug related and tax related felonies in Federal Court in Knoxville on April 29, 2003, and his license was revoked. In May of 2005, Robert J. Pachinger was excluded by OIG from participating in the Medicare/Medicaid programs. He also has several other arrests in Knox County, Tennessee.

126.    Although Robert Pachinger lost his chiropractic license, Relators, Elizabeth Coyle and Elizabeth Merry, state he remained active in Complete Family Care until in or about April of 2012 wherein he triaged patients. When the patients would come into the office, he would take their weight, blood pressure, temperature, and put them in a room for the doctor to see.

127.    Dr. Sugantharaj is from India, and he has been at Complete Family Care for about four (4) years. Dr. Sugantharaj is an internal medicine physician. He worked at Complete Family Care during the full three (3) years of Relator, Elizabeth Merry's employment. He was granted his medical license on 08/03/1994. His medical license number is 25789, and his NPI number is 1386622033.

128.    Robert Pachinger had been married to Fran (Pachinger) Incandela and according to the Relator, Elizabeth Merry, they went through a nasty divorce that was finally granted in or about

49

November of 2012. During this time, Robert Pachinger sent his wife a fax saying something like "you will be caught for taking kickbacks". The fax came across the fax machine, and Relator, Elizabeth Merry, received it and read it, and then she gave it to Fran (Pachinger) Incandela who read it and laughed and threw it in the garbage can. The fax also provided his new phone number, and requested that Relator, Elizabeth Merry, give his wife his new phone number and also that Relator, Elizabeth Merry, call him and tell him what his wife said about the fax. Robert Pachinger called Relator, Elizabeth Merry, once he didn't hear back from her and asked her if she gave the fax to Fran (Pachinger) Incandela. The Relator, Elizabeth Merry, told Robert Pachinger that she laughed when she saw the fax and she threw it in the garbage. The Relator, Elizabeth Merry, does not know exactly what Mr. Pachinger was referring to, but this should be determined. The Defendant, Fran (Pachinger) Incandela changed her last name to Incandela at the time the divorce was finalized. The divorce action was filed in Chancery Court for Knox County and the divorce was granted 11/23/12.

129.    According to Relators, Elizabeth Merry and Elizabeth Coyle, at or about the time the divorce proceedings began in or about April of 2012, Robert Pachinger was in the parking lot telling the employees they better find another job because he had turned the clinic into the TBI because of the illegal things the clinic was doing.

130.    A listing of the "medical providers" at Complete Family Care is as follows:

| Name | Title | NPI Number |
|---|---|---|
| Dr. Andrew Sugantharaj | Physician | 1386622099 |
| Chad Adams | Physician Assistant | 1033420096 |
| Lee Simmons | Physician Assistant | 1689603144 |

| Name | Title | NPI Number |
|---|---|---|
| Judy Smith | Nurse Practitioner | 1225162423 |
| Audrey Marcelle Smith | Physician | 1992818975 |
| Tim Fox | Nurse Practitioner | 1437158961 |
| Sonia Tindell[5] | Nurse Practitioner | 1104891852 |
| Deborah Thomas | Physician | 1912081381 |
| Beverly Baird | Nurse *(Relators do not believe she was licensed)* | Unknown – no results found |
| Mike Wall | Physician Assistant | Unknown – no results found |
| Christina Collins | Nurse Practitioner | 1639379175 |
| Laure Marlow | LPN | Unknown – no results found |
| Lisa Hernandez | LPN | Unknown – no results found |
| Media Simpson | Head Nurse when Liz Merry was hired (worked under Dr. Tindell) | Unknown – no results found |
| Darlene Johnson | Head Nurse | |

131.    A listing of other employees at Complete Family Care include:

| Name | Title | Dates of Employment |
|---|---|---|
| Fran (Pachinger) Incandela | Office Manager/Owner | Since inception to present |
| Elizabeth Merry | Receptionist | Aug 2009 – Jan. 2013 |
| Brenda Bryant | Collections | 2007 – Dec. 2011 |
| Michelle "Shelly" Meyers | Billing | Feb. 2012 – June 2012 |
| Kelly Long-Martin | Billing | Dec. 2011 - present |
| Diane Slinger | Medical Assistant | 2008 – present |
| Francis Fox | Referral Coordinator | 2010 – 2012 |
| Denise Deigel | Xray Tech | Jan. 2012 -   April 2012 |
| Sarah Shiflett | Xray Tech | May 2011 – Jan. 2012 |
| Lesa Goyeau | Nurse for Pounds A Weigh | June 2011 – Sept. 2012 |
| Tara Williams | Employee for Pounds A Weigh | Feb. 2010 – June 2010 |
| Tosha Raymond | Employee for Pounds A | September 2011 (only |

---

[5] Sonia L. Tindell had her A.P.N. Certificate and RN License revoked in November of 2010 for drug related offenses. It is Relator, Elizabeth Merry's understanding that Tindell was also convicted of drug related offenses.

51

| | Weigh | there abt. 2 weeks) |
|---|---|---|

132. During Relators, Elizabeth Coyle and Elizabeth Merry's employment, Lee Simmons treated 80% Suboxone patients and 20% medical patients. Suboxone is a drug that helps get people off of Opiates.

133. Complete Family Care, LLC has paper charts, but everything else such as billing and schedules, are electronic.

134. The employees that handled the billing at Complete Family Care, LLC were Kelly Long-Martin and Michelle Meyers (who goes by Shelly), and they are located at 8861 Kingston Pike, Knoxville, TN. Kelly Long-Martin had apparently been fired from her previous job for upcoding and Fran (Pachinger) Incandela knew about this, but hired her anyway. The Relator, Elizabeth Coyle, believes that Kelly Long-Martin was aware of the upcoding that is hereinafter alleged.

135. Complete Family Care, LLC, substantially increased its billing from approximately one hundred thousand ($100,000.00) per month to approximately two hundred thousand ($200,000.00) per month after Kelly Long-Martin was hired in December of 2011. The Relator, Elizabeth Coyle, was advised of this increase in revenue by Brenda Bryant who was in collections.

136. As far as the increase in revenue from one hundred thousand ($100,000.00) per month to approximately two hundred thousand ($200,000.00) per month, it occurred during the same time Complete Family Care was taking in more and more TennCare patients. When the Relator, Elizabeth Merry, first went to work for Complete Family Care in or about August of 2009, they were not taking TennCare, but thereafter they started seeing TennCare patients.

137.    The head nurse, Beverly Baird, had been an employee of Complete Family Care, LLC ever since January of 2012.  Media Simpson was the head nurse when Relator, Elizabeth Merry, was hired in August of 2009.

138.    A new doctor was hired there in mid-December 2012, Audrey Marcelle Smith, but Dr. Audrey Marcelle Smith's practice address according to the Tennessee Department of Health is Northshore Primary Care, 1341 Branton Boulevard, Suite 101, Knoxville, TN 37922.  Tim Fox quit on Friday, January 11, 2013.  Other Nurse Practitioners that worked for Complete Family Care, LLC during the time Relator, Elizabeth Merry, was employed there included Sonia Tindell, who was supposedly writing prescriptions for patients in the parking lot without even seeing them, but she allegedly lost her license and was convicted.  There was a Physician named Deborah Thomas who began working for Complete Family Care, LLC, sometime in 2009, but Relator, Elizabeth Merry, believes she was fired by Fran (Pachinger) Incandela allegedly for taking too much time with patients.

139.    Several times during her employment, Relator, Elizabeth Merry, was told by Fran (Pachinger) Incandela that they had no interest in getting a quote from a lab other than PCLS.  When other reps would come in the office from other lab companies wanting to speak to the owners about possibly switching to their lab company, Fran (Pachinger) Incandela would tell Relator, Elizabeth Merry, that under no circumstance would they consider switching labs.   They were sticking with PCLS.  Relator, Elizabeth Merry, was also instructed by Fran (Pachinger) Incandela to never disclose to these reps which lab they were using.   Relator, Elizabeth Merry, states this happened on several occasions.

140.    The Relators are in possession of photographs showing computers with Medx

53

software at Complete Family Care taken in the Summer of 2013.

## VI.  Defendant, Optimal Medical Management, LLC, and Defendants, James D. Lord and Christie Lord a/k/a Christie M. Lasater

141.    The Defendant, Optimal Medical Management, LLC, is a North Carolina domestic corporation with its principal address located at 8908 Weaver Crossing Road, Apex, NC 27502.   It was formed 06/18/10.   It is a manager-managed LLC and James D. Lord and Christie Lord are the managers.   It's Registered Agent, James D. Lord, is located at 8908 Weaver Crossing Road, Apex, NC 27502.

142.    In its Annual Report signed 04/25/13, it identifies its managers as James D. Lord and Christie Lord (a/k/a Christie M. Lasater), whose address is 8908 Weaver Crossing Road, Apex, NC 27502.

143.    James D. Lord's address is 8908 Weaver Crossing Road, Apex, North Carolina 27502, and he also uses this address for several of his businesses.   There are other possible addresses for James D. Lord, including 808 Hawthorne Lane, Charlotte, North Carolina 28204, and more recently, 616 Meadow Walk Lane, Lenoir City, TN 37772.   The Relator, J.D. Jenkins, believes he was born in June of 1956.   At one point, he was a real estate sales person and broker in North Carolina, License number 91258 and broker license number 225969.   He apparently operated out of Performance Group Realty, LLC.

144.    James D. Lord was married to Diana Bellana Lord and got divorced on February 11, 2011 in Wake County, North Carolina.   Following his divorce, it is believed James D. Lord married the Defendant, Christie Lasater, age 41.

145.    On "OptiMeds" webpage, under Jim Lord's photograph, it states:

Jim Lord

54

(919) 612-6840
jlord@optimedmgt.com
Jim has more than 20 years of providing strategic management and development services to medical practices of all specialties.

A Proven Track Record of:

- Working with Practices to Identify Strategic Goals and Objectives
- Developing and Implementing Business and Operating Plans
- Developing and Implementing Marketing Plans
- Bringing Innovative Vision and Experience to the Solution of Practice Challenges
- Representing a Practice in High Level Negotiations
- Medical Practice Start Ups and Mergers
- Purchasing and Renovating Office Space
- Office Space Lease Negotiations
- Medical Equipment Purchasing
- Physician Recruitment
- Personnel Management

Jim has a BS in Accounting from Averett University, a Masters in Finance from Virginia Commonwealth University. He is a member of the North Carolina Association of Certified Public Accountants. As well, Jim is a Certified Medical Practice Executive through the Medical Group Management Association and continues his membership with MGMA.

Under "Practice Development", it states, in part:

Practice Development

Strategic Planning/Practice Marketing/Vertical Integration
OptiMed brings strategic vision and innovative insight to private medical practices enabling them to grow and thrive in an increasingly competitive marketplace.

Strategic Planning

Develop, Implement, and Manage Practice Marketing Plan
Identify Practice Expansion Opportunities

- Ancillary Services
- Additional Locations
- Scope of Service Expansion
- Vertical Integration
...

Position your practice to evaluate and take advantage of business opportunities as they present themselves.

55

Then, the webpage lists some "testimonials":

"Jim Lord provided management services to my practice for twelve years until my retirement. I have never worked with someone with such strategic vision and so proficient in creative problem solving."
Robert K. Morrell, Jr., M.D.
President (retired) Carolina Rehabilitation and Surgical Associates, PA
Raleigh, N.C.

"I have worked with Jim and his team for over 10 years. I rely heavily on their expertise and council when making business decisions from my practice. Their advice has been invaluable."

Paul Hoffman, M.D.
Chattanooga, TN

"In my first meeting with OptiMed we identified a financing alternative for the purchase of my new office building that reduced my equity funding requirements by $300,000. Their ongoing management and practice support has been invaluable."

Baher S. Yanni
Prima Pain Relief Center
East Brunswick, N.J.

146. The medical providers providing testimonials for James D. Lord as set forth above, may participate (or may have participated) in the kickback scheme herein described, and this should be determined.

147. Besides James D. Lord's involvement in Optimal Medical Management, LLC, and Southeast Spine & Pain Associates, LLC, Mr. Lord has (or had) involvement in some other businesses that appear to be active companies, including: Vitality Centers, LLC, (he is a managing member and the CEO), 300 Billingsley Road, Suite 204, Charlotte, N.C. 28211, (Phone number 704-334-6488); Vitality Labs, LLC, 300 Billingsley Road, Suite 204, Charlotte, N.C. 28211; Vitality Physicians, PA, 300 Billingsley Road, Suite 204, Charlotte, N.C. 28211; American RX,

56

Inc., Ste. 900, 633 Chestnut Street, Chattanooga, TN 37450, (this is James Lord's attorney, J. Scott McDearman's address); Aegis Compounding Pharmacy, LLC, address is 300 Billingsley Road, Suite 204, Charlotte, N.C. 28211; American Compounding, Inc., 8908 Weaver Crossing Road, Apex, N.C.; Cellular Sciences, LLC, 300 Billingsley Road, Suite 204, Charlotte, N.C. 28211. Some of these businesses may have been owned with (or by Defendant, Douglas R. Smith, or one of his proxies).   In a meeting on May 7, 2013 that was taped by Relator, J.D. Jenkins, James D. Lord inferred he was no longer involved in Vitality Centers, LLC, and that it was being run by Douglas R. Smith's attorney, Avery Chapman's wife.

148.    The Defendant, James D. Lord appears to have an ongoing, active business relationship with the Defendant, Douglas R. Smith.

149.    The Relator was told by Mark Bullock, the former Controller of Optimal Medical Management, LLC, in or about January or February of 2013 that Douglas R. Smith put up the $300,000.00 so James D. Lord could make the purchase of Advanced Pain Therapeutics of Knoxville, TN, LLC, in Knoxville, Tennessee.   This was purchased in 2012.   Mr. Bullock had worked for Optimal Medical Management, LLC, prior to Relator, J.D. Jenkins' hire, and was apparently fired in February of 2013.   With respect to the $300,000.00, it is not clear whether Douglas R. Smith is an "owner", "investor", or made this payment simply to induce the practice to make the referrals of laboratory work to PCLS, as hereinafter alleged.   Mr. Bullock, the former controller, also informed Relator, J.D. Jenkins, in or about February of 2013 and again in May of 2013, that the financial records of Optimal Medical Management, LLC, show a liability to Douglas R. Smith in the amount of $300,000.00.

57

150.    In or about February of 2013, the controller of Optimal Medical Management, LLC, Mark Bullock, provided Relator, J.D. Jenkins, a "Vendor Phone List."   The "Vendor Phone List" does not contain many phone numbers, but this listing may actually be a listing showing who checks have been issued to.  Of note, this "Vender Phone List" contains the name of "Doug Smith".

## VII.    Defendant, Southeast Spine & Pain Associates, LLC.

151.    The Defendant, Southeast Spine & Pain Associates, LLC, ("SSPA"), Tax ID No.: 453090381, NPI No.: 1649523689, was created on 09/11/12.   Its principal address is 900 E. Woodland Avenue, Knoxville, TN 37917-511, and it is a member-managed LLC, phone number: (865) 633-9469.   Its "organizer" was J. Scott McDearman, an attorney from Chattanooga, whose name appears on other business/organization documents of James D. Lord.  Mr. McDearman's address is Suite 900, 633 Chestnut Street, Chattanooga, TN 37430.

152.    Southeast Spine & Pain Associates, LLC is a Tennessee certified pain management clinic (License No.:  000000408).   As of October 31, 2013, the Tennessee Board of Health continues to list Jean N. McGuire as Medical Director, but Relator, J.D. Jenkins, believes Dr. McGuire left that practice.

153.    The NPI number for Southeast Spine & Pain Associates, LLC is 1649523689, and its Group Tax ID Number is 453090381.

154.    At the time Relator, J.D. Jenkins, left his employment, Southeast Spine & Pain Associates, LLC was seeing approximately 35 patients per day (five days a week) of which approximately 70% would be Medicare, 5% would be TennCare, and 25% would be private insurance and private pay.   Of these patients, approximately 100% would be pain patients.

Additionally, of the approximate 35 patients seen per day, approximately 100% would have in-house urine drug tests, and 100% of these labs would be sent to PCLS for "confirmation".

155.    In SSPA's Annual Report signed by Jean N. McGuire on 04/11/13, it indicated its principal office address was 4840 Harvest Mill Way, Knoxville, TN and that Jean N. McGuire was the managing member.   However, the location of the clinic remained at 900 E. Woodland Avenue, Knoxville, TN 37917-511.

156.    Southeast Spine & Pain Associates, LLC's predecessor at the 900 E. Woodland Avenue, Knoxville, TN location was Advanced Pain Therapeutics of Knoxville, TN, LLC ("APT"), NPI No. 1730460411, and they both operated simultaneously out of the same address for a period of time.   At the time this was acquired (August 13, 2012), it apparently was owned by Sonia Crews Foster of Montgomery, Alabama.

157.    Jean Nicholas McGuire, M.D., NPI No. 1558597765, is an Anesthesiologist and he currently works at Professional Pain Management, LLC, in Cleveland, TN.   The Relator, J.D. Jenkins, thinks the Cleveland practice is owned by Dr. McGuire's friend, David Cofer, NP-C.   The practice is located at 3780 Ocoee Place NW, Suite 101, Cleveland, TN 37312. Phone: 423-790-7500.   The Relator, J.D. Jenkins, believes Dr. McGuire also currently works somewhere else in Knoxville, TN.

158.    Dr. McGuire was brought into Southeast Spine & Pain Associates, LLC by James D. Lord, on or about 01/03/13, as the "defacto" owner of Southeast Spine & Pain Associates, LLC, because according to Relator, J.D. Jenkins, the Lords needed a Medical Director and they wanted someone that could do "injections".   It appears that Dr. McGuire may have previously worked

59

with former owner of Advanced Pain Therapeutics of Knoxville, TN, LLC, Dr. Allen Foster, NPI No. 1063681245, prior to Dr. Foster's conviction of Medicare fraud.

159. Dr. McGuire signed paperwork when he was brought into Southeast Spine & Pain Associates, LLC, but Relator, J.D. Jenkins, does not have a copy. The paperwork is probably similar to the paperwork signed by Portia Hutchinson.

160. Southeast Spine & Pain Associates, LLC, was projected by James D. Lord and Christie Lord as being very profitable according to financial projections they prepared and provided to Relator, J.D. Jenkins. For 2013, they projected annual revenue of $2.4 Million with deductions of $929,100 for salaries, $195,000 for the management fee, and $270,000 for the $25,000.00 per month note payment for the purchase of Advanced Pain Therapeutics of Knoxville, TN, LLC. It also showed a projected net profit of $277,161.00.

161. The listing below is additional information on employees working at Southeast Spine & Pain Associates, LLC:

| SSN | Name | DOB | Job Title | Dates of Employment |
|-----|------|-----|-----------|---------------------|
| 558593255 | Tonya Ambler[6] | 04/10/1974 | Nurse Practitioner | Hired prior to Relator, J.D. Jenkins |
| 412192254 | Erika Bassett | 09/05/1972 | Medical Assistant | ? |
| 410418534 | Leakisha Bost | 10/03/1974 | Medical Assistant | ? |
| 408291749 | Donna Gibson | 05/27/1962 | LPN | Terminated June/July 2013 |
| ? | Valerie Glass | Approximate age 47 | Medical Assistant | ? |
| 307726830 | Portia Hutchinson | 11/19/1957 | Nurse Practitioner | Terminated 1st quarter 2013 |
| 415274346 | James Jenkins | 11/24/1961 | Vice President | ? |

---

[6]It is believed her home address is 7123 Grizzly Creek Lane, Powell, TN 37849. Her telephone number is (865) 256-1868.

| SSN | Name | DOB | Job Title | Dates of Employment |
|---|---|---|---|---|
| 277585946 | James Lord | 06/11/1956 | President | Hired prior to Relator, J.D. Jenkins |
| 412419840 | Dr. Jean Nicholas McGuire | 10/31/1975 | Physician (Anesthesiologist) | 01/03/13 - ? |
| 226132940 | Angela Montgomery | 05/01/1970 | Office Assistant – handled check in & check out | Hired prior to Relator, J.D. Jenkins |
| 415083480 | Kandy Simpson | 12/18/1963 | LPN | Terminated November 2013 |
| 275521605 | Larry Sims | 12/29/1954 | Physician Assistant | ? |
| 409191524 | Sharon Smith | 01/28/1958 | Lab Tech | ? |
| 412787178 | Tracy Taylor | 01/08/1961 | LPN | Terminated in approx. February 2013 |
| 408022744 | Terri Whitson | 08/18/1955 | Office Assistant – handled check in at front office | ? |
| 103304970 | Joan Wilson | 11/05/1938 | Lab Director | Quit in October 2013 |

162.    The names and NPI and DEA numbers of the licensed professionals at Southeast

Spine & Pain Associates, LLC, are as follows:

| Name | NPI# | Title | DEA# | Dates of Employment | Reason for Leaving |
|---|---|---|---|---|---|
| Dr. Barry Roseman | 1699777474 | Previous Medical Director | BR2213104 | ? | ? |
| Portia Hutchinson, NP (Expired: 10/13/12, but renewed) | 1336148519 | Prior owner of SSPA & NP | MH2112427 | Left about 03/04/13 | Terminated by Jim Lord |
| Mary Jane Harlan | 1407874860 | NP | MH0851976 | Hired prior to Relator, J.D. Jenkins | ? |
| Larry Sims, PA | 1891821674 | PA & Owner of SSPA | MS1964091 | Hired prior to Relator, J.D. Jenkins | Now owner on paper |
| Tonya Ambler, NP-C | 1316040454 | NP & Owner of SSPA | MA1503982 | Hired prior to Relator, J.D. Jenkins | Now owner on paper |
| Dr. Jean Nicholas McGuire, III | 1558597765 | Physician (Anesthesiologist) | | ? | ? |

61

| Name | NPI# | Title | DEA# | Dates of Employment | Reason for Leaving |
|------|------|-------|------|---------------------|--------------------|
| (License No. 44443) | | | | | |
| Kandy Simpson | ? | LPN | ? | Hired prior to Relator, J.D. Jenkins | Terminated |
| Donna Gibson | ? | LPN | ? | Hired prior to Relator, J.D. Jenkins | Terminated |

163.    Dr. Barry J. Roseman [7], 1027 E. Lamar Alexander Parkway, Maryville, TN 37804-5134, was the Medical Director for Advanced Pain Therapeutics of Knoxville, LLC/Southeast Spine & Pain Associates, LLC ("SSPA").   He served as Medical Director from an uknown period of time until Dr. McGuire became the Medical Director in or about January of 2013. It is Relator, J.D. Jenkins' understanding that Dr. Roseman moved to Atlanta, Georgia. Thereafter, Dr. McGuire became Medical Director.

164.    PCLS provided a full-time employee for SSPA at PCLS' expense during the time Relator, J.D. Jenkins, worked there, and her name was Lindsey Douglas.   Lindsey Douglas' cellular telephone number is (615) 708-6785.

165.    During Relator, J.D. Jenkins' employment, SSPA had a highly complex lab on site that had been supplied by ABS Biomedical (ABSbiomedical.com) out of Texas, address: 2412 Arbuckle Court, Dallas, Texas 75229, telephone: (972) 241-1480.   The highly complex lab was worth about $80,000.00.   SSPA had to purchase reagents from ABS in order to be able to run urinalyses which cost approximately $20±, per test, depending on volume.   SSPA was continually behind on their payments to ABS causing ABS to periodically cut off the supply of

---

[7] It is Relator, J.D. Jenkins' understanding that Dr. Roseman had also served as Medical Director of Bearden Healthcare, but had some kind of falling out with Glen Johnson and his partner.  It is Relator, J.D. Jenkins' understanding that Dr. Roseman is an Oncologist and he moved his practice from Maryville, TN to Atlanta, GA in or about February of 2013.

62

reagents. During Relator, J.D. Jenkins' employment, the supply of reagents was cut off approximately 5 times. Also, during Relator, J.D. Jenkins' employment, ABS would threaten to come and retrieve the highly complex lab, and ultimately, ABS repossessed it sometime after May 2013, and then a lab apparently was furnished by Douglas Smith/PCLS.

166. During Relator, J.D. Jenkins' employment, APT/SSPA also used the same outside lab for confirmation tests - Physicians Choice Laboratory Services, LLC ("PCLS"). Shortly after Relator, J.D. Jenkins was hired, he was told by James D. Lord that under no circumstances would they ever use a different outside laboratory. The Relator, J.D. Jenkins, was allowed by management (Jim & Christie Lord) to make changes, etc., to other aspects of the business, but the Lords told him on at least two (2) occasions they would NOT EVER change the lab "because of ties with Doug Smith". The Relator, J.D. Jenkins, was told that no matter the deal offered by other labs, don't waste his time.

167. During Relator, J.D. Jenkins' employment, Southeast Spine & Pain Associates, LLC used an outside company to do its billing, Medical Billing Solutions TN, LLC. Medical Billing Solutions TN, LLC also did the billing for Southeast Spine & Pain Associates, LLC's predecessor, Advanced Pain Therapeutics of Knoxville, LLC and for Sonia Foster. Medical Billing Solutions, LLC is owned by Beverly Leeds and is located at 422 Seventh Street, Lawrenceburg, Tennessee, 58464.

168. The Relator hired a lab director for the in-house lab, Joan Wilson, in or about February, 2013. It is Relator, J.D. Jenkins' understanding that APT/SSPA operated their lab without a lab director from about September of 2012 until the Director, Joan Wilson, was hired in

February of 2013, yet billed anyway, and Relator, J.D. Jenkins, understands Ms. Wilson is no longer working for SSPA so they may be once again without a lab director.

169. Sonia Crews Foster apparently acquired Advanced Pain Therapeutics of Knoxville, TN, LLC, ("APT"), from her husband (or ex-husband), Dr. Allen Foster, an anesthesiologist, who also had a clinic in Morristown, TN. Dr. Foster was fined and sentenced to prison for Medicare and TennCare fraud on July 15, 2011. As part of the plea agreement, Dr. Foster surrendered his license to practice medicine. The pain clinic in Knoxville at 900 E. Woodland Avenue, thereafter, began to be operated by Dr. Foster's wife, the Defendant, Sonia Crews-Foster.

170. An article that appeared in KnoxViews on November 9, 2011, indicated the nature of Dr. Foster's practice at the Woodland Avenue, Knoxville, TN, address prior to his conviction:

> Advanced Pain Therapeutics has opened across the street from the corner of Woodland Ave and Huron St near St. Mary's Hospital. A quick drive through the parking lot reveals Georgia, Florida, and North Carolina tags on cars and many rural East Tennessee county tags. People are sleeping in cars as well. Is this a legitimate business? Given the Sheriff's deputy cruising the alley behind the facility, one must wonder.
>
> This is the border between Old North Knoxville and Oakwood, which are two quiet neighborhoods filled with beautiful homes and lots of working class people with kids. Residents should be vigilant as property crime could go up if this is a pill mill. As a matter of fact, the authorities need to reassure us that this is not a pill mill. It if is, then it needs to be shut down forthwith.

171. When Sonia Crews Foster decided to sell her interest in Advanced Pain Therapeutics, Defendants, Jim Lord and Christie Lord a/k/a Christie M. Lasater convinced Defendant, Portia Hutchinson, a licensed Physicians Assistant to "purchase" the clinic as herein discussed while simultaneously signing an Option Agreement that made her only a proxy "owner", and she also signed an exclusive Management Agreement with the Lords' company: Optimal Medical Management, LLC.

64

172.    It appears that Defendant, Douglas R. Smith handled all the initial negotiations for the purchase of Sonia Crews Foster's pain clinic.   The Relator, J.D. Jenkins was advised by Sonia Crews Foster in a phone conversation in October of 2013, that Defendant, Douglas Smith handled all the negotiations for the purchase of Advanced Pain Therapeutics and she met James and Christie Lord through Douglas Smith.   Sonia Crews Foster told Relator, J.D. Jenkins, that in the initial negotiations, that Douglas Smith was really involved in that, and she felt like he was behind all this, and in her own words, she now believes "they are crooks", as they are jerking her around on the payments.

173.    James and Christie Lord (and/or Doug Smith) convinced Portia Spencer Hutchinson to become the proxy owner of Advanced Pain Therapeutics, LLC, prior to August 13, 2012.   Portia Spencer Hutchinson, NPI – 1336148519, is a Nurse Practitioner licensed in Tennessee (License No. 5771).   She originally received her Nurse Practitioner license on August 13, 2004.   Prior to that, she was an RN, License No. 59481.   Her RN license was originally issued on January 26, 1983. Both of her licenses are currently active.   At the time she became the proxy owner, she had already been working at Advanced Pain Therapeutics of Knoxville, TN, LLC.

174.    On August 13, 2012, Portia S. Hutchinson, 103 Palmetto Lane, Oak Ridge, TN 37830 and Sonia Crews Foster, 8001 Lake Ridge Drive, Montgomery, AL 36117 signed a "Membership Interest Purchase Agreement" wherein she "purchased" Ms. Foster's membership interest in Advanced Pain Therapeutics of Knoxville, LLC for $834,982.00, most of which was to be financed.   A note for $606,963.35 was executed by Portia S. Hutchinson and this note was "guaranteed" by a recently formed LLC called:   Optimal Medical Management of Tennessee, LLC.   This "guaranty" was signed by James D. Lord on behalf of this newly formed LLC.   A

65

"Management Services Agreement" by and between Advanced Pain Therapeutics, PA [sic] and Optimal Medical Management, LLC, was signed on August 13, 2012.

175. On October 1, 2012, Sonia Crews Foster signed an "Assignment" assigning all of her "membership interest" in Advanced Pain Therapeutics of Knoxville, TN, LLC, to Portia S. Hutchinson and a "Memorandum of Proceedings". Sonia Crews Foster also signed an "Assignment" of bank account number 026032417 at Jefferson Federal Bank to Optimal Medical Management, LLC.

176. On 09/13/12, Portia S. Hutchinson also signed the Operating Agreement for Southeast Spine & Pain Associates, LLC, the Organizational Minutes for Southeast Spine & Pain Associates, LLC, and a "Contribution Agreement".

177. <u>Portia S. Hutchinson also signed an "Option Agreement" giving Optimal Medical Management, LLC an "irrevocable option" to purchase all of Southeast Spine and Pain Associates, LLC's assets</u>, including all "patient charts" for "_____" (the amount was not filled in) which can be paid "at closing or over time by promissory note".

178. Portia S. Hutchinson also executed a "Management Services Contract" on September 13, 2012 with Optimal Medical Management, LLC, on behalf of Southeast Spine & Pain Associates, LLC. The Option Agreement and Management Agreement were the devices used by the Lords to retain ultimate control and ownership.

179. It is not stated how, or if, the initial purchase of Advanced Pain Therapeutics of TN, LLC, and the conveyance of patient files, or how or if, the subsequent conveyances of the "patient files" complied with HIPPA.

66

180.    Portia Hutchinson remained a proxy owner at the practice until in or about Jan/Feb of 2013.   After Dr. McGuire was brought in as "owner", the Lords and Optimal Medical Management, LLC, apparently slowly did away with the Advanced Pain Therapeutics of Knoxville, TN, LLC, ("APT") entity and began using Southeast Spine & Pain Associates, LLC, exclusively. It is Relator, J.D. Jenkins' understanding that Portia Hutchinson "owned" both APT & SSPA.   The Lords had Portia Hutchinson transfer assets from APT to SSPA, then transfer her "ownership" of SSPA to Dr. McGuire.   The Relator, J.D. Jenkins, did not retain a copy of the paperwork she signed when she left the practice.   Approximately 30 days after the "ownership" was transferred, James Lord fired Portia Hutchinson.

181.    When Relator, J.D. Jenkins, was approached by James D. Lord, he was somewhat familiar with Advanced Pain Therapeutics, LLC, and he was aware of Dr. Foster's conviction, and prior to being hired, Relator, J.D. Jenkins, wanted assurances from James D. Lord that Dr. Foster was no longer involved in the pain clinic, and he received that assurance from James D. Lord.

182.    It is the Relator, J.D. Jenkins' understanding that during the time Defendant, Sonia Crews Foster owned the pain clinic, she may have had a previous relationship with Douglas Smith, Shaun Thompson, and Physicians Choice Laboratory Services, LLC, and therefore, may have received kickbacks in return for making referrals to Physicians Choice Laboratory Services, LLC, as hereinafter described, but this is not clear.   However, Advanced Pain Therapeutics of Knoxville, TN, LLC and Southeast Spine & Pain Associates, LLC, were using PCLS before Relator, J.D. Jenkins, was hired.

183.    After Relator, J.D. Jenkins, was terminated on May 13, 2013, he unsuccessfully attempted to return on June 10, 2013 to manage Southeast Spine & Pain Associates, LLC, for Dr.

McGuire, as described herein, and as referred to in the text messages from Dr. Nick McGuire, it appears Dr. McGuire may have severed his ties with SSPA and entered into a settlement with SSPA and with James Lord and Christie Lord. Dr. McGuire retained a Knoxville attorney, Keith Burroughs. As Dr. McGuire stated in a text to Relator, J.D. Jenkins **on June 13, 2013 at 8:15 p.m.**:

> "After some long talks and a bunch of lawyer paperwork with a very expensive indemnification of me, I think it was the safest thing for me and my family to get the company in their names and get out."

The Relator, J.D. Jenkins, does not know if Dr. McGuire actually got out of Southeast Spine & Pain Associates, LLC, or if he was merely trying to put off the Relator, J.D. Jenkins. However, the Tennessee Board of Health Web page for Certified Pain Management Clinics, as of October 31, 2013, indicates that Dr. McGuire is still "Medical Director" of SSPA. It is Relator, J.D. Jenkins' understanding based on a conversation with Sonia Crews Foster that supposedly, a retired doctor from Chattanooga, Dr. Thomas Miller, who had previous ties to James D. Lord was being brought in to serve as "Medical Director" of SSPA. Dr. Thomas Miller is one of the owners of Specialists in Pain Management, P.C.

184. It is Relator's understanding that sometime thereafter, in or about October of 2013, Dr. McGuire left Southeast Spine & Pain Associates, LLC, but Relator does not know the details or circumstances. Dr. McGuire is currently shown on the Internet as practicing at Professional Pain Management, LLC., located at 3780 Ocoee Place NW, Suite 101 Cleveland, TN where he had previously worked part-time. It is Relator, J.D. Jenkins' understanding that Dr. McGuire performs procedures at Skyridge Medical Center in Cleveland, TN. Relator, J.D. Jenkins, believes Dr. McGuire is also practicing at another location in Knoxville, TN, but Relator, J.D. Jenkins

68

does not know where.

185.    Following his termination, the Relator, J.D. Jenkins, has periodically heard from Sonia Crews Foster because she is still owed significant money following the sale of Advanced Pain Therapeutics of Knoxville, TN, LLC, and her note has not been timely paid.    Relator, J.D. Jenkins, was told by Sonia Crews Foster on July 7, 2013 that Southeast Spine & Pain Associates, LLC has been placed under the "ownership" of Larry Sims, PA and Tonya Ambler, NP, two employees who were working there when Relator, J.D. Jenkins, worked there.    The Relator, J.D. Jenkins, believes they probably signed "Option Agreements", similar to that signed by Portia Hutchinson (and by Dr. McGuire), giving Optimal Medical Management, LLC, the "irrevocable option" to purchase all assets, including "patient charts" of Southeast Spine & Pain Associates, LLC.    In fact, James D. Lord told Sonia Crews Foster that he "owns Tonya & Larry".    James and Christie Lord via Optimal Medical Management maintain exclusive and ultimate control and/or ownership via the option device.

186.    Shortly after Relator, J.D. Jenkins was hired, he was asked by Christie Lord to go to a meeting in Charlotte, North Carolina to meet Douglas Smith and the "Team".    The meeting occurred at the Ritz in downtown Charlotte – the meeting occurred at dinner.    Present at this meeting were: James D. Lord and Douglas R. Smith, Avery Chapman (Douglas R. Smith's Attorney), Mark Bullock and his wife, another male employee of PCLS whose name Relator, J.D. Jenkins can't recall, Lou Fisher (apparently a retired DEA pharmacist), and James D. Lord's CPA.    At the meeting, James Lord introduced Douglas Smith to him as "the owner" of PCLS. Douglas Smith sat across from Relator, J.D. Jenkins, at dinner and briefly talked about the lab and its growth.    The following day Douglas Smith almost insisted that Relator, J.D. Jenkins, go with

69

him to see PCLS, but Relator, J.D. Jenkins, was dealing with professional liability issues on behalf of the practice and declined to go.

## VIII.    Defendant, Specialists in Pain Management, P.C./Southern Pain Specialists, PLLC

187.    Specialists in Pain Management, P.C. is a Tennessee corporation with its principal address at 2339 McCallie Avenue, Suite 309, (Hamilton County) Chattanooga, Tennessee 37404. Its Charter was originally filed on 01/04/95.

188.    It is owned, at least in part, by Thomas P. Miller, M.D.   Also, Dr. John E. Blake is affiliated in some manner.

189.    Dr. Thomas Miller is apparently acting as Medical Director of Southeast Spine & Pain Associates, LLC, in Knoxville, TN following the departure of Dr. McGuire as relayed to Relator, J.D. Jenkins, by Sonia Crews Foster.

190.    Specialists in Pain Management, P.C. is a certified pain management clinic in Tennessee (Facility No. 000000194), and the Tennessee Department of Health lists Thomas P. Miller, M.D. as the Medical Director.

191.    It is Relator, J.D. Jenkins' understanding that Specialists in Pain Management, P.C. has a relationship with James D. Lord and Christie Lord and might be managed by Optimal Medical Management, LLC.   When Relator, J.D. Jenkins, was setting up the website for Southeast Spine & Pain Associates, LLC he was told by James D. Lord to copy Specialists in Pain Management's website, and when the Relator, J.D. Jenkins, expressed concern about potential copyright violations, James D. Lord sent him an email stating that "There is no copyright on this web site. Christie wrote the entire web site."

70

192     Additionally, the Relator, J.D. Jenkins called Specialists in Pain Management, P.C. in Chattanooga in or about June/July of 2013 (Telephone: 423-520-6257) and told them that PCLS and Medx had given them as a reference.   He spoke to the receptionist, and he was told they use PCLS as their lab and they use Medx, and said they recommend them.

193.    Given the above, the Relator, J.D. Jenkins believes that Specialists in Pain Management, P.C., may be involved in the kickback scheme herein described.

## IX.    Defendant, Bearden Healthcare Associates, P.C.

194.    Bearden Healthcare Associates, P.C. is located at 10321 Kingston Pike, Knoxville, Tennessee, 37922.   On information and belief, the owners of Bearden Healthcare Associates, P.C. are Dr. Frank McNiel, M.D., Glenn D. Johnson, D.C. and Jerry Railey, D.C.

195.    Bearden Healthcare Associates, P.C. is a certified pain management clinic in Tennessee (Facility No. 00000020), and the Tennessee Department of Health lists Richard Aballay, M.D. as the Medical Director.

196.    The Relator, J.D. Jenkins met Glenn Johnson, D.C. of Bearden Healthcare Associates, P.C., at a dinner to celebrate Douglas Smith's birthday at Bakers Peter Jazz House in Knoxville, Tennessee on or about March 19, 2013.   Also present at this dinner were Douglas R. Smith, Dr. Sugantharaj of Complete Family Care, James Lord and Christie Lord, and Relator, J.D. Jenkins and his wife, and Lou Fisher (alleged retired DEA pharmacist), Shaun Thompson, and Ian Clarke.   Dr. Glenn Johnson, D.C., gave the Relator, J.D. Jenkins, his business card at this meeting. Glenn Johnson's cell phone number is (865) 803-8678, and his personal email address is: glennpegj@aol.com.

71

197. Relator, J.D. Jenkins, called Bearden Healthcare Associates, P.C. in or about June/July of 2013 and talked to the person answering the telephone and said that Physicians Choice Laboratory Services and Medx had given their name as a reference and were they satisfied? The person answering the phone stated "yes, very satisfied".

198. Additionally, Relator also obtained photos showing computers with Medx software on the screens at Bearden Healthcare Associates, P.C. and at Complete Family Care, PLLC.

199. Given the above, and on information and belief, Bearden Healthcare Associates, P.C., makes referrals to PCLS and in return, receives valuable remuneration.

**X.      Defendant, Greater Knoxville Medical Center, LLC**

200. Defendant, Greater Knoxville Medical Center, LLC, is a Tennessee limited liability company formed on 09/26/11. Its address was 417 Holly Street, Knoxville, TN 37917. It was "member managed" and its member was identified as John Dawson, using the same address. It was administratively dissolved on 08/13/13 for failure to file its annual report.

201. When Relator, Elizabeth Coyle, left Complete Family Care in June of 2012, she went to work for Greater Knoxville Medical Center, LLC, located at 417 Holly Street, Knoxville, TN 37917 (Telephone: 865-522-9661), and Shaun Thompson and Ian Clarke came into that practice multiple times setting up the computers and helping the practice get up and running, "almost as if they owned the practice". Relator, Elizabeth Coyle, said if she didn't know who the owners were, she would have thought the owners were Shaun Thompson and Ian Clarke. Everything had to be approved and/or ran by Shaun Thompson. Relator, Elizabeth Coyle, was informed the owners of this clinic were a married couple "(John & Kimmie)" who live in Palm Springs, Florida, and the father of the female owner is allegedly a DEA agent. During her

72

employment at Greater Knoxville Medical Center, Relator, Elizabeth Coyle, heard the owner, John_____, (she does not recall the owner's last name, but according to the 2012 Annual Report, the "member" is <u>John</u> Dawson) say that the equipment and software were provided by Shaun Thompson of Medx. They also used PCLS. Their lab person was Mike - (the Relator, Elizabeth Coyle, cannot recall his last name), but he was formerly placed at Bearden Healthcare by PCLS to monitor/run labs before coming to Greater Knoxville Medical Center, LLC. The Relator, Elizabeth Coyle, believes that Greater Knoxville Medical Center was raided by the Feds, and thereafter was shut down in December of 2012.

## XI. Defendants, Vitality Centers, LLC/Vitality Physicians, PA

202.    The Defendant, Vitality Centers, LLC, is a North Carolina domestic corporation located at 8908 Weaver Crossing Road, Apex, NC 27502. (This address appears to be a residential address and is probably James D. Lord's and Christie Lord's residence in North Carolina). Its Registered Agent, James Lord, is located at 8908 Weaver Crossing Road, Apex, NC 27502.

203.    The Defendant, Vitality Physicians, PA, is located at 300 Billingsley Road, Suite 204, Charlotte, NC 28211.

204.    The Defendant, Vitality Centers, LLC, operates specialized clinics for males. It is the Relator's understanding that Defendants, James D. Lord and Christie Lord (a/k/a Christie M. Lasater), had an ownership interest in these facilities and/or were managed by the Defendants, James D. Lord and Christie Lord (a/k/a Christie M. Lasater). It is Relator, J.D. Jenkins' understanding that Douglas Smith is an owner, and as stated in ¶147, Attorney, Avery Chapman's wife may be managing these clinics at this time.

73

205. On information and belief, the Defendants, Vitality Centers, LLC, provide referrals to Physicians Choice Laboratory Services, LLC, and have received kickbacks from Physicians Choice Laboratory Services, LLC.

## XII. Defendants, Aegis Compounding Pharmacy, LLC./American Compounding, Inc./Cellular Sciences, LLC./ American RX, Inc./Vitality Labs, LLC.

206. The Defendants, Aegis Compounding Pharmacy, LLC's address is 300 Billingsley Road, Suite 204, Charlotte, NC 28211; American Compounding, Inc.'s address is 8908 Weaver Crossing Road, Apex, NC 27502; Cellular Sciences, LLC's address is 300 Billingsley Road, Suite 204, Charlotte, NC 28211, American RX, Inc.'s address is Ste. 900, 633 Chestnut Street, Chattanooga, TN 37450; and Vitality Labs, LLC's address is 300 Billingsley Road, Suite 204, Charlotte, NC 28211, may also be involved in the kickback scheme.

207. Apparently, Douglas R. Smith is involved with James Lord in these Defendants and/or Smith may be a proxy owner, and Relator, J.D. Jenkins, does not know the details or the exact business performed by each entity. One of the entities apparently "souped up" testosterone that was used by Vitality Centers, LLC/Vitality Physicians, PA, and James Lord and Douglas R. Smith bragged to Relator, J.D. Jenkins, about how profitable it had become. Additionally, Douglas R. Smith informed Relator, J.D. Jenkins, that one of their entities allegedly purchased a large quantity (700,000 to 800,000) Roxicodone or Oxycodone from a distributor and they were supplying three (3) pain clinics with this medication. The Relator, J.D. Jenkins, does not know if this is tied in with the kickback scheme or not, but this should be determined. Douglas R. Smith told Relator, J.D. Jenkins, their intent was to mail these pills to patients in "discrete packages". If the patients got the pills through their entity, then the patients would only have to go in to the pain

74

clinics once a month as opposed to every two (2) weeks, and this may be tied in to the kickback scheme herein alleged.

## X. NARRATIVE OF PARTICULARS

**A.** **Physicians Choice Laboratory Services, LLC:   Kickbacks.**

**B.** **Douglas Smith, Shaun Thompson, Physicians Choice Laboratory Services (PCLS), Their Associates And/Or Affiliated Companies Provided Kickbacks To Optimal Medical Management, LLC, To Southeast Spine And Pain Associates, LLC, To Complete Family Care, To Bearden Healthcare Associates, P.C., To Specialists In Pain Management, P.C., To Greater Knoxville Medical Center, LLC, And To Other Medical Practices In Return For Sending Lab Referrals To PCLS.**

208.    The Relators allege that Physicians Choice Laboratory Services, LLC, via Douglas R. Smith, Shaun Thompson, their associates, their affiliated companies, and/or straw companies have provided remuneration to pain clinics, and to other medical practices, in return for sending drug confirmation lab work and other lab work to Physicians Choice Laboratory Services, LLC. The kickbacks provided include, but are not limited to, providing equipment, computers, furniture, lab equipment, software, consulting services, computer services, and staffing free of charge.   In return for this valuable remuneration, the medical clinics/pain clinics agree to use PCLS exclusively and agree to send lab work to PCLS.

209    The Relators have specific knowledge that Douglas R. Smith and Shaun Thompson on behalf of PCLS provide valuable computers, software, equipment, furniture, big screen monitors, computer screens, printers, scanners, computer servicing, and provide consulting services to Advanced Pain Therapeutics of Knoxville, TN, LLC/Southeast Spine & Pain Associates, LLC, where Relator, J.D. Jenkins worked and to Complete Family Care, LLC, where the Relators, Elizabeth Coyle and Elizabeth Merry worked, and to Greater Knoxville Medical Center, LLC,

75

where Relator, Elizabeth Coyle worked. Relator, J.D. Jenkins states that the software and printers provided were also used to write and print prescriptions for medications for patients.

210. On information and belief, Southeast Spine & Pain Associates, LLC, (and/or its predecessor, Advanced Pain Therapeutics of Knoxville, TN, LLC), were provided approximately twelve (12) computers, one (1) large 50 inch flat screen monitor, four (4) tables for the computers, three (3) printers, two (2) scanners, and software free of charge. They also received free consulting services and free computer servicing. The computers had already been provided prior to Relator, J.D. Jenkins' arrival in December of 2012. According to the shipping label/package slip, the computer tables were ordered on September 6, 2012 and arrived shortly thereafter at the address of Southeast Spine & Pain Associates, LLC, addressed to "Medx/Doug Smith". This shipment was billed to Doug Smith at his home address. Some of this delivery may have been taken by Shaun Thompson to another medical practice.

211. Complete Family Care, LLC, was provided approximately 11 computers, 3 large 50 inch flat screen monitors, 2 tables for the computer self-tests, 3 printers, software, and computer servicing. When Relator, Elizabeth Coyle was hired in August of 2011, they were in the process of installing and placing all of this equipment at Complete Family Care. The Relators, Elizabeth Coyle and Elizabeth Merry, state that once Complete Family Care made the switch to PCLS, the computer equipment and software, etc., was provided as a condition of Complete Family Care using PCLS for lab testing. This was also blatantly stated to Relator, Elizabeth Merry, when Douglas R. Smith initially came into the practice and introduced himself and Shaun Thompson.

212. In or about August of 2011, Douglas R. Smith and Shaun Thompson came into Complete Family Care and spoke with Relator, Elizabeth Merry. Douglas R. Smith presented her

76

with a business card.   As she recalls, the card said PCLS Laboratories and Medx below that, and it said something about urine testing.   As she recalls, the card had both Douglas R. Smith and Shaun Thompson's names on the same card.   Douglas R. Smith told her that he was "the owner" of a new lab called Physicians Choice Laboratory Services, LLC, and his "partner", Shaun Thompson, handled the technical side of the business, and they would like the opportunity to do business with Complete Family Care.   Initially, Fran (Pachinger) Incandela, one of the owners, was not interested in speaking with Douglas Smith and Shaun Thompson, but after they returned to Complete Family Care on at least two (2) to three (3) additional occasions requesting to meet with Fran (Pachinger) Incandela and advising they would make it "worth her while", she agreed to meet with them.   After Fran (Pachinger) Incandela met with Douglas Smith and Shaun Thompson, she agreed to start using PCLS labs.

213.    During their employment at Complete Family Care, both Relators, Elizabeth Merry and Elizabeth Coyle, heard Fran (Pachinger) Incandela state the computers, equipment, and software were being provided by Shaun Thompson.   It was common knowledge that Shaun Thompson was the person providing the computer equipment, software, computer screens and big screens, and printers – the equipment also said Medx on the actual equipment.

214.    During their employment, Relators, Elizabeth Merry and Elizabeth Coyle, were both asked directly by Shaun Thompson if they knew of other clinics who could use his computer equipment, and if they could get the clinic to get set up with his equipment, he would get them a better job at the clinic.

215.    PCLS also provided software, and the training on how to use the software, and how to bill Medicare.   The software allows the pain clinics to obtain additional revenue from Medicare

77

for having their patients take psychological self-tests using CPT Code 96103. Shortly after Relator, J.D. Jenkins, was hired by SSPA, he was told by PCLS "salesman"/Medx representative, Shaun Thompson, that the pain clinic should be charging for psychological "self-tests". The software was already loaded on the computers, and that this was another source of revenue for the practice. Shaun Thompson via Medx and PCLS had provided the computers, the tables, the chairs, the training, the computer servicing, and even explained how to code the psychological self-tests for billing purposes.

216. Medicare reimburses for the psychological tests at the rate of $57.68 per test. SSPA started having patients take these tests in approximately February of 2013, and approximately 700 patients a month were taking it, of which approximately 70% would be Medicare patients. This was implemented at SSPA in or about February 2013, and James and Christie Lord had the bills changed for prior visits to include this charge so they could back bill for approximately 60 days. It is Relator, J.D. Jenkins' belief that these patients had taken the self-tests, but Medicare had not been billed. Shaun Thompson had brought it to the attention of the practice that they needed to bill for the self-tests. James and Christie Lord instructed the staff at SSPA to change the superbills to include the charge for the self-tests. It is also Relator, J.D. Jenkins' understanding that the providers had to sign off on these superbills, and the providers had instructed the staff at SSPA to attach their signatures.

217. The Relator, J.D. Jenkins, estimates that since it was implemented at Southeast Spine & Pain Associates, LLC, in February of 2013 (plus back-billed for approximately 60 days), and at approximately 35 patients a day taking this "self-test", five days a week, this means that since it was implemented at Southeast Spine & Pain Associates, LLC, approximately 8,000± patients

78

have taken the psychological self-tests. Of this number, approximately 70% (5.659) would be Medicare patients so that means approximately 5,600 self-tests have been billed to Medicare at $57.98 per test through November of 2013 for a total of $328,137.00 at SSPA alone.

218. At a meeting with James D. Lord and Christie Lord at Calhoun's on May 7, 2013, the Relator, J.D. Jenkins, recorded the meeting. They discussed the questionable nature of this self-test, but planned to keep billing Medicare for it until it was stopped.

219. The same process involving billing for psychological tests was implemented at Complete Family Care after they switched to PCLS according to Relator, Elizabeth Merry. Every patient who signed in at Complete Family Care had to take the computer self-test (psychological test). There would be approximately fifty (50) to sixty (60) patients a day seen at Complete Family Care, five days a week. The computer self-tests came with the switch to using PCLS for labs instead of using Path Group Laboratory. Shaun Thompson is the person who set up the computer self-tests at Complete Family Care. These tests have been taken since approximately September of 2011. Assuming this practice began in or about September of 2011, that would mean that since that date, approximately 25,000 self-tests were given, of which 70% or 17,640 would have been billed to Medicare. At $57.98 per test, this would equate to Medicare payments of $1,022,767.20, all at no cost at all to the pain clinic, except the agreement to make referrals to PCLS.

220. Relators, Elizabeth Merry and Elizabeth Coyle, have knowledge that Ian Clarke and Shaun Thompson spent many hours working at Complete Family Care working on the computers. Relator, Elizabeth Coyle, recalls that Ian Clarke was there almost every day for approximately 4 to 5 hours a day for an approximate 6 week period – this was in approximately the October and November of 2011 time frame. Ian Clarke was there to work with the computers and to fix any

79

computer problems they may have. He was the "tech" guy for Medx. Relator, Elizabeth Coyle, recalls that Shaun Thompson was there more in the beginning – in the August and September of 2011 time frame when the computer equipment was first being installed. He was there to help get all of the computer equipment, printers, screens, etc., installed and then Ian Clarke did the tech side where he repaired any technical errors. Relator, Elizabeth Merry, recalls that Ian Clarke was there more than Shaun Thompson was. Ian Clarke was there anytime there was a problem with the computers. Ian Clarke was the tech guy for Shaun Thompson. Relator, Elizabeth Merry, recalls that Ian Clarke was there about 3 to 4 days a week fixing computer problems and the problem they had with the printers printing out the wrong prescriptions for patients. Relator, Elizabeth Merry, recalls if there was a problem with the computers, she would call Shaun Thompson and Shaun Thompson would send Ian Clarke to fix the problem. After they were up and running and were familiar with the equipment, they would only see Ian Clarke when there was a problem. Relator, Elizabeth Merry, states that Shaun Thompson lived in Florida and Ian Clarke lived in Knoxville. Shaun Thompson would come in two (2) to three (3) times a month, and he would walk around and look at all the equipment and would talk with Fran (Pachinger) Incandela, and he would then take Fran (Pachinger) Incandela and Dr. Sugantharaj to dinner.

221. The free software also performs other valuable functions for the clinics such as tracking patients and writing prescriptions. It had a template which pulled the patient and provider data and printed the prescription orders on a laser printer. Relator, J.D. Jenkins, believes PCLS may have used the Medx software to pull the patient data in order to do their billing to Medicare and others. The patient data was (and is) entered into Medx software when the patient arrives. This includes name, address, telephone number, date of birth, social security number, insurance

80

information, etc. A scanner, which was provided by Medx/PCLS, was used to scan in the front and back of driver's licenses and insurance cards (commercial & Medicare, etc.). As stated herein, the Relator, J.D. Jenkins, believes PCLS must have had access to this data to allow them to bill for their lab services. The Relator, J.D. Jenkins, cannot think of another way PCLS could have received this data. Beverly Leeds, the owner of the billing company, confirmed to Relator, J.D. Jenkins, that she did not provide PCLS anything. In fact, she had no idea who PCLS was. The Relator, J.D. Jenkins, believes that this may prove yet another tie in with PCLS, Medx, and Douglas R. Smith.

222. Douglas R. Smith also furnishes "compliance consultants" to the pain clinics including an allegedly "retired" pharmacist by the name of Louis Fisher, RPh., who resides in Florida.[8] His business card identifies his business as "Controlled Substance Consultant," and states: "Pharmacy Regulatory Compliance and Pain Management Specialist". The Relator, J.D. Jenkins, was given this card by Mr. Fisher in or about February of 2013. The Relator, J.D. Jenkins, had personally observed Mr. Fisher come to Southeast Spine & Pain Associates, LLC, on at least three (3) occasions and he reviewed patient charts with providers. Mr. Fisher told Relator, J.D. Jenkins, that Doug Smith sends him into the pain clinics and pays him. Relator, J.D. Jenkins, states Louis Fisher told him his travel expenses were billed on Douglas Smith's credit card on the last visit he saw him. He made the statement because he said "they" were changing the way he gets paid, and they were going to start to reimburse him, and for him not to use Douglas Smith's credit card. However, Christie Lord told Relator, J.D. Jenkins, she paid for his time.

---

[8] When Relator, Elizabeth Coyle, went to work for Greater Knoxville Medical Center, LLC, she was told that the father of the female owner was a "DEA agent". The owners were from Florida. This may be a coincidence.

81

223.    The Relator, J.D. Jenkins, has direct knowledge that Shaun Thompson, Douglas R. Smith, Medx Software, Inc. and/or Medxsoftware Development, LLC provides software, computer equipment, computer servicing, and consulting services to Bearden Healthcare Associates, PC, located at 10321 Kingston Pike, Knoxville, TN 37922, because he visited the premises and saw the computers with Medx software there.   He also was given Dr. Glenn Johnson's business card during a dinner at Bakers Peters Jazz House to celebrate Douglas R. Smith's birthday.   In attendance were Douglas R. Smith, James Lord, and others.   Also, Shaun Thompson mentioned on several occasions to Relator, J.D. Jenkins, that he was doing something or was going to do something at Bearden Healthcare.   The Relator, Elizabeth Coyle, has no knowledge of Bearden Healthcare other than it used PCLS for its labs because when she left Complete Family Care and went to Greater Knoxville Medical Center, the lab person that was provided by PCLS that was assigned to work at Greater Knoxville Medical Center named "Mike" (she cannot recall his last name) told Relator, Elizabeth Coyle, he used to work for PCLS at Bearden Healthcare until PCLS moved him to Greater Knoxville Medical Center.

224.    As previously stated, the Relator, J.D. Jenkins, retained a mailing label addressed to "Medx/Doug Smith" at the address for Southeast Spine & Pain Associates, LLC.   This mailing label was on a shipment to Southeast Spine & Pain Associates, LLC, from Global Equipment Company, 2505 Mill Center Pkwy, Suite 100, Buford, Georgia 30518.   This address label came with the delivery of desks ordered by Medx/Doug Smith.   The desks would be used by patients taking the psychological tests (computer self-tests).   The packing slip indicated the shipment would be billed to:   "Bill To:   Doug Smith, 1146 Crestbrooke Drive, Charlotte, NC 28211", which is believed to be Douglas R. Smith's home address.   At Southeast Spine & Pain Associates,

82

LLC, there are four (4) computers that are in the front lobby for the patients to use when they take the psychological tests (computer self-tests). The address label indicated the delivery consisted of three (3) packages weighing 411 pounds. It was Relator, J.D. Jenkins' understanding these desks were provided "free of charge" by Douglas Smith/Medx. In early 2013, Shaun Thompson came to Southeast Spine & Pain Associates, LLC, to pick up one of the computer desks that had come with this delivery to take it to another practice that needed it. Shaun Thompson told the Relator, J.D. Jenkins, that he had put the charge for the desks on Douglas Smith's credit card.

225. The Relator, J.D. Jenkins, has knowledge that the computer equipment, the computers, the software, the computer servicing, and computer tables were provided at no charge to SSPA. On or about March 19, 2013, he attended a meeting in the lobby of APT/SSPA after the patients had left. Present at the meeting were Relator, J.D. Jenkins, Douglas R. Smith, James D. Lord, Christie Lord, Ian Clarke, Dr. McGuire, Portia Hutchinson, Shaun Thompson, Lou Fisher, and two (2) others from PCLS, and another retired DEA employee. Relator, J.D. Jenkins, brought up that there was no charge for the equipment – the computers, and Douglas Smith said there was no charge.[9] Douglas R. Smith informed the Relator, J.D. Jenkins, that they could get around this by calling it a "test site".

226. Additionally, the Relator, J.D. Jenkins, opened the mail at APT/SSPA and he never saw a bill related to computers, desks, software, computer servicing, consulting, or furniture, and to his knowledge, no payment was ever made by SSPA.

227. The Relators, Elizabeth Merry and Elizabeth Coyle, have direct knowledge that Shaun Thompson, Douglas Smith, Medx Software, Inc. and/or Medxsoftware Development, LLC provides software, computer equipment, tables, computer servicing, and consulting services to

---

[9] It is unclear to Relators who actually owns the furniture, equipment/computers, etc., that are placed at the pain clinics.

Complete Family Care of Knoxville, located at 8861 Kingston Pike, Knoxville, TN 37923, where Dr. Andrew Sugantharaj is the Medical Director. Relators, Elizabeth Coyle and Elizabeth Merry, are aware that 11 computers were provided with software installed, 3 big screens were provided, 2 tables were provided, 3 printers were provided, computer servicing and software assistance were provided, as were paper for the scripts. All were provided "free" of charge to the best of their knowledge, information, and belief. This was provided in or about August and September of 2011. It was Relator, Elizabeth Merry's understanding that Douglas R. Smith and Shaun Thompson provided all this for going with PCLS.

228. Relators, Elizabeth Merry and Elizabeth Coyle, have knowledge that Shaun Thompson also supplied a urine analyzer in about September of 2011. Relator, Elizabeth Merry, was there when Shaun Thompson supplied the urine analyzer. This urine analyzer was used in-house for urine drug screens and would print out a report of the findings. Additionally, Relator, Elizabeth Coyle, states that reagents for the urine analyzer were provided by PCLS. Relator, Elizabeth Coyle, recalls the urine analyzer was furnished right after she began working at Complete Family Care. Relator, Elizabeth Coyle, states that a refrigerator also had to be installed with the urine analyzer - this was all a part of going with PCLS. The results for the urine analyzer would show up in the computer, and the analyzer would also provide printouts that would be placed in the patients' charts at Complete Family Care. PCLS also provided a lady named "Anita" _____ (Relator, Elizabeth Coyle, cannot recall her last name) to run the urine analyzer. Relator, Elizabeth Coyle, also states that Fran (Pachinger) Incandela was bragging about how expensive the urine analyzer was. When Fran (Pachinger) Incandela found out "Anita" _____ was gay, she had

84

PCLS remove her and send someone else to run the analyzer. There were also two (2) PCLS employees supplied to follow the patients into the rooms to watch them take their urine tests.

229. In December of 2011, Complete Family Care began sending 100% of the in-house labs for "confirmation" to PCLS, and they began requiring their patients to have monthly urinalysis testing.

230. Mark Bullock, Controller for Optimal Medical Management, LLC, informed Relator, J.D. Jenkins, in about February of 2013 and again in May of 2013 that Douglas R. Smith had provided $300,000.00 to James and Christie Lord so they could "acquire" Advanced Pain Therapeutics of Knoxville, TN, LLC from Sonia Foster. Advanced Pain Therapeutics of Knoxville, TN, LLC, was acquired in or about August of 2012, and Southeast Spine & Pain Associates, LLC, thereafter eventually began operating out of Advanced Pain Therapeutics of Knoxville, TN, LLC's old address: 900 East Woodland Avenue, Knoxville, TN in or about September of 2012. Both pain clinic names were used simultaneously, and Medicare was billed under both names for a period of time. It is Relator, J.D. Jenkins' understanding that when Advanced Pain Therapeutics of Knoxville, TN, LLC, was purchased from Sonia Foster, she was paid $200,000.00 down and the other $100,000.00 was apparently used by Jim and Christie Lord for other things. Sonia Foster was also given a promissory note for $606,963.35, signed by Portia Hutchinson and guaranteed by Optimal Medical Management of Tennessee, LLC.

231. The Relator, J.D. Jenkins, believes that Douglas R. Smith (and/or his trust, associates, and/or affiliated companies) may have financed the acquisitions of other pain clinics (or medical clinics), and may have set-up straw companies or proxy ownership arrangements or put up the front end cash to acquire the clinics in return for an agreement to make referrals to PCLS.

85

232.     PCLS provides employees to collect the specimens ordered at the pain clinics free of charge at Advanced Pain Therapeutics of Knoxville, TN, LLC/Southeast Spine & Pain Associates, LLC, and Complete Family Care, PLLC.   The PCLS employee at Southeast Spine & Pain Associates, LLC, was Lindsey Douglas.   Lindsey Douglas routinely did non-PCLS work for Southeast Spine & Pain Associates, LLC, including collecting specimens and dealing with the patients, and giving the specimens to Sharon Smith for the in-house labs, and otherwise saving SSPA money by not having to pay an employee for performing these services.   The Relator, J.D. Jenkins, believes PCLS places employees in other pain clinics who also did work for the pain clinics in addition to any work done for PCLS, and Relators, Elizabeth Merry and Elizabeth Coyle, confirmed there was a PCLS employee at Complete Family Care.

233.     Relator, J.D. Jenkins, states PCLS had Southeast Spine & Pain Associates, LLC, sign an agreement in or about April of 2013 to the effect that they agreed not to use the PCLS employee for non-PCLS work, but this "agreement" was totally ignored.

234.     Tessa Gaugreaux was the employee of Physicians Choice Laboratory Services, LLC, ("PCLS") provided to work for free at Complete Family Care, PLLC, until she left in approximately March of 2012 because Fran (Pachinger) Incandela apparently called PCLS and told PCLS she did not want Tessa Gaugreaux there anymore.   It is Relator, Elizabeth Merry's understanding that PCLS transferred Tessa Gaugreaux to a clinic closer to her home – she believes in Morristown.   Ms. Gaugreaux routinely performed non-PCLS work for Complete Family Care, LLC, including handling referrals and triage.

235.     According to Relator, Elizabeth Merry, when Tessa Gaugreaux first started with Complete Family Care, she was working for Path Group.   Tessa Gaugreaux told Relator, Elizabeth

86

Merry, that Shaun Thompson offered her a job with PCLS and gave her more money. This is additional proof of Shaun Thompson's connection to PCLS. Prior to being supplied the analyzer, Complete Family Care, PLLC used dip cup urinalyses. It is the Relator, Elizabeth Merry's understanding that PCLS provided the analyzer, but Relator, Elizabeth Merry does not know what, if anything Complete Family Care, PLLC paid for the analyzer, and this should be determined. The analyzer uses reagents and PCLS, via Shaun Thompson, supplies those, but Relator, Elizabeth Merry, does not know what Complete Family Care pays for the reagents, if anything. Tessa Gaugreaux told Relator, Elizabeth Merry, that Fran (Pachinger) Incandela also had them sending the urine samples to PCLS for confirmation testing in North Carolina to be re-tested again, and she said this was unnecessary and created more work for her to do. Tessa Gaugreaux told the Relator, Elizabeth Merry, in or about February of 2013 that Complete Family Care, PLLC was receiving kickbacks and used words to the effect: "They make extra money if they send drug screens to PCLS".

236. During the time Tessa Gaugreaux was working at Complete Family Care, from June/July 2011 Complete Family Care was initially only sending labs for confirmation that were positive, but in or about the first of December, 2011, Complete Family Care began sending out all of the urine samples for confirmation testing by PCLS. According to Relator, Elizabeth Merry, this was after Complete Family Care switched to PCLS and had received the new computers, and then they started sending out all labs to PCLS. Complete Family Care got the equipment in August/September 2011, and then it was about 3 months thereafter, in about December 2011 they began sending every test out to PCLS. Sending out all urine samples for confirmation is medically unnecessary.

87

237. Tessa Gaugreaux left Complete Family Care in or about March of 2012, and she was replaced by PCLS with "Cameron" _____ (last name unknown) and "Paula" _____ (last name unknown), a son and mother team. The Relators, Elizabeth Merry and Elizabeth Coyle, do not recall their last names. The employees would go into the bathrooms with the patients to get the urine samples. The employee that was analyzing the urine samples at Complete Family Care, PLLC, was Christine Miller.

238. The Relator, Elizabeth Merry, would see Shaun Thompson and/or Dr. Douglas R. Smith periodically at Complete Family Care, PLLC. She observed Douglas R. Smith there a couple of times in or about August of 2011 when they first switched to PCLS. Shaun Thompson would come into the office approximately three to four times a week during the time frame of August/September of 2011 when the computers and other equipment were being installed. The Relators, Elizabeth Merry and Elizabeth Coyle, would also see Ian Clarke at Complete Family Care approximately four to five times a week fixing computer problems in September of 2011, and thereafter, as needed to fix computer problems. It was their understanding that Shaun Thompson worked for Medx/PCLS and that Ian Clark worked for Shaun Thompson/Medx. The Relator, Elizabeth Merry, would also observe Shaun Thompson and Douglas R. Smith come in to Complete Family Care, PLLC, and they would have closed door meetings with Fran (Pachinger) Incandela and Dr. Sugantharaj.

239. It would appear that the routine confirmation labs, the routine monthly urinalysis, and the routine psychological self-tests, besides being fraudulent and medically unnecessary, may also violate Medicare Regulation, 42 C.F.R. 410.32(a), which states in part:

> "…diagnostic tests must be ordered by the physician who is treating the
> beneficiary, that is, the physician who furnishes a consultation or treats a

88

beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem."

This would seem to preclude coverage for such routine testing/screening.

240.    Optimal Medical Management, LLC, and Southeast Spine & Pain Associates, LLC, exclusively used Physicians Choice Laboratory Services ("PCLS") for their confirmation and other labs throughout the time of Relator, J.D. Jenkins' employment.   Early on in Relator, J.D. Jenkins' employment (in or about January of 2013), the Relator, J.D. Jenkins, was told by James and Christie Lord that "under no circumstances would we ever change from PCLS".   Relator, J.D. Jenkins, later learned the reason for this was due to kickbacks the Lords, Optimal Medical Management, LLC, Southeast Spine & Pain Associates, LLC, and/or others were receiving from PCLS/Douglas R. Smith.   The Relator, J.D. Jenkins, called PCLS when he first began his position as Vice President of SSPA, just as he called other vendors.   The day Relator, J.D. Jenkins, called PCLS, Shaun Thompson called James Lord, and thereafter, James Lord called Relator, J.D. Jenkins, and told him to stop contacting PCLS.   Relator, J.D. Jenkins, had contacted PCLS to inquire how they were doing the billing and what CPT Codes they were using, etc.   Relator, J.D. Jenkins, states he was trying to do his job and see how things were operated within the practice from a management standpoint, and he also wanted to confirm what CPT Code the practice was to use for the in-house highly complex lab.   The Relator, J.D. Jenkins, states he was just doing what he thought a new manager should do going into a new business – ask questions.   Relator, J.D. Jenkins, states that Shaun Thompson called James Lord and told him that Relator, J.D. Jenkins, had been calling PCLS "asking questions".   James Lord told Relator, J.D. Jenkins, to stop calling PCLS and to never contact PCLS again.

89

241.     The Relator, Elizabeth Merry, does not know who paid Shaun Thompson, but she understood Shaun Thompson worked for Douglas R. Smith because his name was on the business card with Douglas R. Smith when they introduced themselves.   Douglas R. Smith introduced himself as the owner of PCLS, and Shaun Thompson was introduced as his "partner" who supplied the equipment. The Relators, Elizabeth Merry and Elizabeth Coyle, understood that Douglas R. Smith was the owner of PCLS, and Shaun Thompson was the owner of Medx, and that once Complete Family Care went with PCLS, Medx/Shaun Thompson supplied all the computer equipment and software, and Ian Clarke worked for Shawn Thompson as his computer tech person.

242.     In August and September of 2011, Douglas R. Smith and Shaun Thompson supplied the analyzer and the computer system which consisted of 11 computers, 3 flat screens, 2 tables, 3 printers, and they provided the paper for the scripts.   After this was provided, other lab companies would come into the office and try to get Complete Family Care, PLLC, to change lab companies, but Fran (Pachinger) Incandela instructed Relator, Elizabeth Merry to tell the lab companies:   "We are not interested in going with another lab", and they continued to use PCLS exclusively.   Fran (Pachinger) Incandela told Relator, Elizabeth Merry, under no circumstances would they consider switching to another lab from PCLS.   Prior to switching to PCLS, Complete Family Care used Path Group for labs.

243.     The Relator, Elizabeth Merry, does not believe that Fran (Pachinger) Incandella admitted in her presence that she received "kickbacks", but while the divorce was pending between Fran (Pachinger) Incandella and her husband, Robert Pachinger, in or about November of 2012, the Relator, Elizabeth Merry, saw a fax come in from Fran Pachinger's husband, Robert Pachinger that stated words to the effect: "Someone is going to find out about all of these kickbacks you are getting

90

from the lab and I hope they get you".   This fax was on a sheet of paper that was handwritten and the Relator, Elizabeth Merry, took the fax to Fran (Pachinger) Incandella and she just laughed and threw it away.   The Relator, Elizabeth Merry, saw this fax because it came to the fax machine that was located at her work station.

244.    Another item that was provided by Shaun Thompson/Douglas R. Smith/PCLS was big flat screens.   They were about 50 inches and they indicated where the patients were and which patient room they were in.   Shaun Thompson brought these in to Complete Family Care in September of 2011.   There was one in the front office and there was one at the nurse's station and there was one in a patient room.   A total of three (3) flat screens were provided to Complete Family Care.   At SSPA, there was only one flat screen provided by Douglas R. Smith/Shaun Thompson/PCLS according to Relator, J.D. Jenkins.

245.    The Relator, Elizabeth Merry, states that Shaun Thompson was at Complete Family Care more than Douglas R. Smith.   Shaun Thompson was there almost every day when the computers and equipment were being installed, and then 3 to 4 times a month thereafter.   Ian Clarke was in the office approximately 3 to 4 times a week when they were having problems with the computer equipment.   Douglas R. Smith was at the office before they switched, and approximately two (2) times after they switched to PCLS in August of 2011, and that was it.

246.    Self-pay patients at Complete Family Care would be charged with an office visit for approximately one hundred and fifty dollars ($150.00).   This charge was supposed to include the urine tests.   The self-pay patients would receive additional bills from PCLS because they would have approximately one (1) drug test per month (on each visit), and these drug tests started to be sent out to PCLS for "confirmation" in or about December of 2011, and the patients started

91

receiving bills from PCLS for approximately one thousand dollars ($1,000.00) for the confirmation labs. These patients were very upset when they started getting these bills from PCLS, and about twenty (20) patients a week came to Relator, Elizabeth Merry, complaining to her about the PCLS bills.

247.     About this time, a posting from PCLS was put up at the front of the office at Complete Family Care on the two (2) computers where the patients signed in and took the self-tests that provided PCLS's phone number (1-855-725-7123), and the posting promised to answer questions about the patients' bills. Relator, Elizabeth Merry, would tell the patients referred to in ¶246 to call PCLS to discuss the bills.

248.     Initially, patients at Complete Family Care would call the telephone number listed for PCLS and would be told that they were responsible for the PCLS bills, and the patients would be very upset and would complain again to Relator, Elizabeth Merry. Relator, Elizabeth Merry, discussed this problem with Fran (Pachinger) Incandela and then with Shaun Thompson, and they told the Relator, Elizabeth Merry, to tell the patients "not to worry about the bill from PCLS", and that's what the Relator, Elizabeth Merry, started telling the patients.

249.     The Relator, Elizabeth Merry, believes PCLS stopped billing the co-pays and the self-pay patients shortly after this conversation because after she told the patients not to worry about the bills from PCLS, the patients didn't complain to her anymore about continuing to receive bills from PCLS. Also, shortly after her conversation with Fran (Pachinger) Incandela and Shaun Thompson, the posting from PCLS that had been placed on the computers with PCLS' telephone number, was taken down. It had been posted for approximately two (2) to three (3) weeks before it was taken down.

92

250. The Relator, J.D. Jenkins, does not believe that PCLS sent bills to self-pay patients of SSPA because if they did, the patients would object to receiving these bills and/or would stop coming back to the pain clinic. The Relator, J.D. Jenkins, periodically received calls or inquiries from patients who were insured questioning why Medicare or their insurance company was being billed for $700 from PCLS for "confirmation labs" "every time I come in for a urinalysis", but Relator, J.D. Jenkins <u>never received this type of call from self-pay patients</u> – never! When Relator, J.D. Jenkins, got these calls, he would tell the patients that SSPA does not bill for the confirmation lab that PCLS performs. Additionally, the Relator, J.D. Jenkins, remembers a conversation that he had with Donna Gibson, Front Office Manager at SSPA. During this conversation, the Relator, J.D. Jenkins, asked her about PCLS billing self-pay patients for their labs. Donna Gibson's brother or brother-in-law, "Hollis", was a self-pay patient there, and she contacted him and he said that he never received a bill from PCLS for the confirmation labs.

251. Shaun Thompson also brought into Complete Family Care brochures from PCLS. The brochures were in English and also in Spanish, and explained:

> Why Am I Being Tested?
>
> <u>While your health is our top priority, it is recommended that physicians nationwide implement and maintain a comprehensive, therapeutic drug monitoring program.</u> To achieve this, your physician, will ask for a urine sample to accurately record the levels and analytes within your system. This ultimately provides a more complete treatment program for you.

As far as the patients' bills, the PCLS posting explained:

> **About My Bill?**
>
> PCLS has the best billing program Nationwide. Not only do we offer the lowest cash price available, <u>but if you have ANY questions concerning your bill our team looks forward to helping you in every</u>

way.   Rest assured cash and insurance based patients benefit from
your doctors choice with PCLS.

252.    Relator, J.D. Jenkins, recalls these same PCLS brochures were at Southeast Spine &

Pain Associates, LLC.   The brochures were brought in to SSPA in or about April of 2013 by Shaun

Thompson.

253.    Upon information and belief, PCLS entirely wrote off the bills of self-pay patients,

and PCLS wrote off patient co-pays and deductibles for patients of the medical clinics ordering

medically unnecessary confirmatory urine drug screening, and it continues to engage in this

practice.

254.    On information and belief, PCLS entirely wrote off the bills of self-pay patients, and

wrote off patient co-pays and deductibles without regard to patients' financial circumstances, and it

continues to engage in this practice.

255.    On information and belief, PCLS does not practice balance billing.

256.    PCLS knowingly engaged in a conspiracy and marketing scheme wherein PCLS

encouraged medical clinics, in return for receiving kickbacks, to excessively test patients without

regard to medical necessity, and it continues to engage in this practice.

257.    To be eligible for Medicare reimbursement, Physicians Choice Laboratory Services,

LLC, ("PCLS"), has to sign a certification on a provider application containing language stating

that it understood that "payment of a claim by Medicare is conditioned upon the claim and the

underlying transaction complying with [Medicare] laws, regulations and program instructions

(including, but not limited to, the Federal Anti-Kickback Statute and the Stark Law), and on the

provider's compliance with all applicable conditions of participation in Medicare."

94

258.    Thus, compliance with the Anti-Kickback Act is a material condition of payment by the Medicare program.  *United States ex. rel. Fry v. The Health Alliance of Greater Cincinnati,* 2008 WL 5282139, *12 (S.D. Ohio December, 18, 2008); *United States ex. rel. A+ Homecare, Inc. v. Medshares Management Group, Inc.,* 400 F.3d 428, 445 (6th Cir. 2005).

259.    The Medicare program and other governmental programs would not have paid for PCLS's claims if Medicare had known that these claims were based on referrals obtained in violation of the Anti-Kickback Act.    Therefore, PCLS concealed its violations of the Anti-Kickback Act from the Medicare program and from the other governmental programs in order to defraud the government into paying claims that it would not otherwise have paid, and otherwise falsely certified with respect thereto.  *United States ex. rel. Pogue v. American Healthcorp, Inc.,* 914 F.Supp. 1507, 1513 (M.D. Tenn. 1996).

260.    Accordingly, all claims submitted by PCLS based on referrals obtained in violation of the Anti-Kickback Act are false claims under the False Claims Act, and all amounts paid by the Medicare program to PCLS as reimbursement for such claims constitute damages under the False Claims Act.  *United States v. Rogan,* 517 F.3d 449, 453 (7th Cir. 2008).  *See also,* False Claims Act, 31 U.S.C. § 3729, *et. seq.*, and 42 U.S.C. § 1320a-7b(b)(g).

**C.    Physicians Choice Laboratory Services, LLC:    Overutilization Involving Confirmation Labs.**

261.    During his employment, the Relator, J.D. Jenkins, discovered in or about January of 2013 that Optimal Medical Management, LLC, and Advanced Pain Therapeutics of Knoxville, TN, LLC/Southeast Spine and Pain Associates, LLC, were requiring their patients to undergo monthly urinalysis testing and they were sending out 100% of their in-house urinalysis lab tests for "confirmation tests" to PCLS even though they had conducted their own in-house urinalysis, the

95

majority of times on their highly complex lab, so there was no medical necessity for the vast majority of these confirmation labs.

262.     The patients' charts should reflect when labs are sent for confirmation and when the confirmation report is received.

263.     This same practice of requiring patients to have a monthly urinalysis was implemented at Complete Family Care in or about December of 2011 as herein alleged, and thereafter, they also implemented the practice of sending out 100% of these labs for "confirmation" in or about December of 2011 without regard for medical necessity.

264.     Medicare contractors have issued local coverage determinations regarding Qualitative Drug Screening.   For example, Palmetto GBA issued LCD ID Number L31561 which provided, in part:

> "Confirmation of drug screens (80102) is indicated when the result of the drug screen is different than that suggested by the patient's medical history, clinical presentation or patient's own statement."

Other Medicare contractors have issued similar coverage determinations.  (See, e.g., LCD ID L28145).  There is no medical justification (medical necessity) in ordering 100% confirmation labs.   Yet, PCLS has corrupted the process by bribing medical clinics to fraudulently order 100% of the urinalysis labs for "confirmation" in return for the lucrative kickbacks it provides.   The Relators believe this process has been occurring at other clinics/medical practices that have received kickbacks from PCLS.

265.     During his employment, from December of 2012 – May 2013, the Relator, J.D. Jenkins, would estimate that Southeast Spine & Pain Associates, LLC, was sending approximately 45 confirmation tests per day (five days a week) to PCLS.   Approximately, 31 (or 70%) of these

96

tests would be for Medicare patients. PCLS would bill these confirmation labs under CPT Code 80102. Given that Southeast Spine & Pain Associates, LLC, would require approximately 45+ patients per day (5 days per week) to have a urinalysis, and thereafter would send out all labs for "confirmation" testing, this has resulted in millions of dollars of overbillings to Federal and State programs.

266. It appears that both Complete Family Care, LLC and Southeast Spine & Pain Associates, LLC, began performing monthly urinalysis and sending out all in-house labs for "confirmation" shortly after they received the free software, consulting services, computers, tables, big screens, printers, furniture, etc., described herein. On information and belief, other clinics involved in the kickback scheme with PCLS have engaged in similar fraudulent practices involving excessive and medically unnecessary urinalyses and confirmation labs.

**D. Additional Allegations Involving Southeast Spine & Pain Associates, LLC**

**1. Overutilization Of In-House Urinalysis Labs**

267. Southeast Spine & Pain Associates, LLC, has a highly complex lab on site. Drug testing using this lab is billed at CPT Code G0431 which is reimbursed by Medicare at $102.99. The State of Tennessee suggests that pain clinics should do a urinalysis on a patient's first visit and then perform random urine checks two (2) times. However, Defendant, Southeast Spine & Pain Associates, LLC, routinely orders a urinalysis on every patient every month when there is no medical necessity, resulting in inflated billings to Medicare, TennCare, and to other governmental providers, to self-pay patients, and to private insurance. Complete Family Care implemented identical routine in-house monthly urinalysis labs after it received the free equipment and computers as herein alleged.

97

268.     Medicare contractors have issued Local Coverage Determinations governing the frequency of drug screening and the indications to establish medical necessity for urinalyses.   For example, Palmetto GBA issued LCD Number L31561 which provides, in part:

> "Medicare will consider performance of a qualitative drug screen medically <u>reasonable and necessary</u> when a patient presents with suspected drug overdose and one or more of the following conditions:
> - Unexplained altered mental status in the absence of a clinically defined toxic syndrome or toxidrome;
> - Severe or unexplained cardiovascular instability (cardiotoxicity);
> - Unexplained metabolic or respiratory acidosis in the absence of a clinically defined toxic syndrome or toxidrome;
> - Seizures with an undetermined history;
> - For monitoring patient compliance during active treatment for substance abuse or dependence.
> <u>A qualitative drug screen is medically reasonable and necessary for the monitoring of chronic pain patients in whom other illicit drug use is suspected</u>.
> Drugs or drug classes for which screening is performed should reflect only those likely to be present, based on the patient's medical history or current clinical presentation.   Drugs for which specimens are being screened must be indicated by the referring provider in a written order."

The Coverage Determination also provides:

> "Other Comments:
>
> Limitation of liability and refund requirements apply when denials are likely, whether based on medical necessity or other coverage reasons.   The provider/supplier must notify the beneficiary in writing, prior to rendering the service, if the provider/supplier is aware that the test, item or procedure may not be covered by Medicare.   The limitation of liability and refund requirements do not apply when the test, item or procedure is statutorily excluded, had no Medicare benefit category or is rendered for screening purposes.
>
> This LCD does not apply to acute inpatient (11x) claims."

Other Medicare providers have issued similar determinations. (See, e.g., LCD ID L28145). Clearly, the routine monthly urinalysis screenings do not meet medical necessity requirements of Title XVIII of the Social Security Act and Section 1862(a)(1)(A).[10]

269. The Relator, J.D. Jenkins, in or about January/February 2013, tried to stop testing patients monthly, and to follow state guidelines. The Relator, J.D. Jenkins, worked with Dr. McGuire to establish a reasonable schedule based on 1st visit and patients' birthdays so as to provide a drug screen urinalysis three (3) times per year. Relator, J.D. Jenkins, prepared a document and distributed it to staff with Dr. McGuire's approval. The practice of routine monthly testing stopped for a brief time from about March of 2013 to April of 2013, but James and Christie Lord bumped the frequency back up to monthly one day when the Relator, J.D. Jenkins, was out of town in or about mid-April of 2013. The Relator, J.D. Jenkins, objected to this frequency and told James Lord it was overutilization and it was fraudulent. The Relator, J.D. Jenkins, was told "we need the revenue", so the overutilization practice continued and was going on at the time Relator, J.D. Jenkins, was fired.

270. The Relator, J.D. Jenkins specifically objected to this overutilization directly to James and Christie Lord on several occasions, including the day of the Relator, J.D. Jenkins' termination. The Relator, J.D. Jenkins, also discussed the overutilization issue with Dr. McGuire on numerous occasions including the day he was terminated.

---

[10] Tennessee State guidelines provide that pain clinics must have policies and procedures, which at a minimum include:

(ii) a written drug screening policy and compliance plan for patients to include random urine drug screening as clinically indicated, but at a minimum, upon each new admission and once every six (6) months thereafter. (Rules of Department of Health Division of Pain Management Clinics, Chapter 1200-34-01-.07).

99

271.     The overutilization continued past the date of Relator, J.D. Jenkins' termination and overutilization was mentioned at Relator, J.D. Jenkins' termination meeting on May 13, 2013.

272.     Since 100% of the in-house labs were sent out to PCLS for confirmation, overutilization of in-house labs would also increase the number of confirmation labs sent to PCLS.

### 2.     Overutilization of Psychological Self-Tests

273.     Advanced Pain Therapeutics of Knoxville, TN, LLC/Southeast Spine & Pain Associates, LLC, began requiring patients to take the psychological self-tests monthly in or about February 2013.   This was done to generate additional revenue, and it is Relator, J.D. Jenkins' understanding this was not medically necessary.   The Relator, J.D. Jenkins' also recalls that James and Christie Lord had the bills at SSPA changed for prior patient visits so they could bill for these psychological self-tests back to January 2013.

### 3.     Upcoding Involving In-House Labs.

274.     During Relator, J.D. Jenkins' employment, Southeast Spine & Pain Associates, LLC, billed for their in-house highly complex labs on all urinalyses using CPT Code G0431 with a reimbursement of $102.99, when in fact, many of the urinalyses were being run in dip cups and not using the highly complex lab.   SSPA should have been using CPT Code G0434 for dip cup urinalysis with a reimbursement rate of $19.99.   Defendant, Southeast Spine & Pain Associates, LLC, would normally perform approximately 45+ urinalyses per day (or 956± per month).   SSPA would perform dip cup urinalysis tests when the in-house lab ran out of reagents for their highly complex lab ("analyzer") which was quite often when they were behind on their payments or when the lab director, Joan Wilson, was out, but Southeast Spine & Pain Associates, LLC, would still bill Medicare as if they were performing the highly complex lab (CPT Code G0431), instead of the dip

100

cup urinalysis (CPT Code G0434). The Relator, J.D. Jenkins, does not know all the dates they ran out of reagents, but he did make a note that the highly complex lab (the "analyzer") had been out of reagents from at least May 17, 2013 until at least June 30, 2013, per Joan Wilson, the Lab Director.

275. Moreover, on Southeast Spine & Pain Associates, LLC's superbill, there was no box for dip cup urinalysis (CPT Code: G0434). There were only boxes for the highly complex labs, G0431 (for Medicare) and 80101 (for everyone else). The Relator, J.D. Jenkins, tried to correct this by adding a box (the code) for dip cup urinalysis in or about April/May of 2013, but James Lord overruled this.

276. Southeast Spine & Pain Associates, LLC, would frequently run out of reagents because Optimal Medical Management, LLC, would fail to pay the supplier, ABS Biomedical's bill, and they would perform dip cup urinalyses, but would bill Medicare for a complex lab. The Relator, J.D. Jenkins, specifically objected to James D. Lord about the fraudulent billing for dip cup urinalyses as highly complex labs to no avail.

277. Although dip cup urinalyses were frequently performed, it is Relator, J.D. Jenkins' understanding that <u>all</u> urinalyses were billed as highly complex labs (G0431), and there would be <u>no</u> billings for dip cup urinalyses, pursuant to CPT Code: G0434, so CMS could determine if SSPA ever billed Medicare for dip cup urinalyses using code G0434. Second, in order to verify the fraudulent upcoding for dip cup urinalyses, patient charts would need to be audited. When a test is run at SSPA on the highly complex labs, a lab print out is generated and it is put in the patient's chart. When a dip cup urinalysis is performed, a photocopy of the results strip is made and that is put that in the patient's chart or nothing will appear in the chart. The lab printout or photocopy can then be compared with how the urinalysis was billed to Medicare.

101

278.     The Relator, J.D. Jenkins, would estimate that during the time he was working for Southeast Spine & Pain Associates, LLC, that SSPA would periodically perform dip cup urinalyses, but would fraudulently bill these to CPT Code G0431.   Relator, J.D. Jenkins, states it was not a standard amount per month, but he would estimate that it was in excess of 1,000 during the period of his employment based on when they were out of reagents.   Based on Relator, J.D. Jenkins' discussions with Joan Wilson, the lab director, it is his belief this practice continued after his departure and even after the highly complex lab was picked up by ABS for nonpayment.

**4.     Nurse Practitioner Seeing Patients And Writing Prescriptions For Controlled Substances Who Had Failed To Pass Her Renewal For Her Board Certification To Be A Nurse Practitioner.**

279.     The Relator, J.D. Jenkins, learned in approximately March of 2013 that Tonya Sunshine Ambler, a Nurse Practitioner who was working for Southeast Spine & Pain Associates, LLC, had failed to pass the renewal for her Board Certification to be a Nurse Practitioner when BCBS would not credential her.   Nurse Ambler's NPI number is 1316040454.   Nurse Ambler resides in Powell, Tennessee.   She remains licensed in Tennessee as a Registered Nurse (License No. 119817).   She originally was licensed as a Registered Nurse on July 7, 1998, and her license has an expiration date of April 30, 2014.   Relator, J.D. Jenkins, confirmed with the TN Nursing Board that failing to pass the renewal for Board Certification for a Nurse Practitioner bumps the Nurse Practitioner down to an RN, and they can no longer prescribe controlled substances or bill for patients as a Nurse Practitioner even though they might still be registered with DEA.   Relator, J.D. Jenkins, is uncertain when Nurse Ambler's Board Certification expired, but he discovered this in or about March 2013.

102

280.    Relator, J.D. Jenkins, brought this issue to Nurse Ambler's attention, to the attention of Dr. McGuire, and to the attention of James and Christie Lord on several occasions.   When this was brought to Nurse Ambler's attention, her response in the presence of James Lord and Christie Lord was "I still have my DEA license", and Nurse Ambler continued seeing patients as a "Nurse Practitioner", and she continued writing prescriptions for controlled substances, and as far as Relator, J.D. Jenkins knows, bills were sent to Medicare, TennCare and others.

281.    On June 7, 2013, Dr. McGuire informed Relator, J.D. Jenkins, that he "agreed" with Relator, J.D. Jenkins, that Nurse Ambler should not be seeing patients and/or writing prescriptions for controlled substances since she was no longer a Nurse Practitioner, and he had allegedly stopped this practice.   However, Dr. McGuire left Southeast Spine & Pain Associates, LLC, in or about September of 2013, and Relator, J.D. Jenkins, believes the practice may have started up again. Tonya Ambler was or should have been aware of her change from a Nurse Practitioner to an RN as Dr. McGuire informed Relator, J.D. Jenkins, that while employed at KOC she also failed her renewal test and was fired as a result.   Additionally, it is Relator, J.D. Jenkins' understanding that Nurse Ambler is now an "owner" of SSPA.

282.    Even though Nurse Ambler was billing for seeing patients and writing prescriptions for controlled substances without her Board Certification for some time before March of 2013 through June 7, 2013 (and probably longer), Relator, J.D. Jenkins, does not believe this has been reported to Medicare, TennCare, or other governmental providers, or that a refund was made.

283.    Nurse, Tonya Ambler would see an average of twenty (20) to thirty (30) patients a day, five (5) days a week, and approximately 70% of these would be Medicare patients.   Using the

103

figure of twenty (20) patients a day, from the time period prior to March of 2013 to June 7, 2013, she would have billed for approximately 1,300 patients, without her certification.

**E.     Additional Allegations Involving Complete Family Care.**

### 1.      Overutilization of In-House Urinalysis Labs

284.     In or about December of 2011, Complete Family Care started performing urine tests on <u>each</u> patient monthly, and as previously stated, this was medically unnecessary and was done to generate additional revenue.   It is Relator, Elizabeth Merry's understanding that these labs were billed using CPT Code G0431.   As previously stated, 100% of these labs were sent out for confirmation to PCLS.

### 2.      Overutilization of Psychological Self-Tests

285.     Complete Family Care began requiring patients to take the psychological self-tests monthly in or about September of 2011.   This was done to generate additional revenue, and it is Relators, Elizabeth Merry and Elizabeth Coyle's understanding this was not medically necessary.

### 3.      Upcoding:   Low Back Pain

286.     During her employment, the Relator, Elizabeth Coyle, learned that many patients at Complete Family Care were being billed for "lower back pain", but they did not have lower back pain.   They could go into the clinic with, for example, an infection and walk out with a diagnosis of "lower back pain".   Michelle "Shelly" Meyers is the employee in the billing department who told the Relator, Elizabeth Coyle, about this.   Michelle "Shelly" Meyers told the Relator, Elizabeth Coyle, that the majority of the patients were being billed as lower back pain, and when the Relator, Elizabeth Coyle, examined the charts, she would only see approximately five (5) charts a day out of the twenty-five (25) charts a day that actually should have been coded as low back pain.   It is

104

Relator, Elizabeth Coyle's understanding that the coding of low back pain was to justify the prescription for the pain medication.

### 4.    Upcoding:   Diabetes Patients

287.    The Relator, Elizabeth Coyle, needed to identify potential patients to participate in the study she was working on for her employer and she was given free access to the medical charts at Complete Family Care, and in or about December of 2011, she asked the billing department to print out a listing of every patient during the past three (3) years that had been diagnosed with diabetes in the practice because she was looking for potential participants in her study.   The billing department printed the names of every patient that had been diagnosed with diabetes during the past three (3) years and there were about three hundred (300) people who had been diagnosed with Type I or Type II diabetes.   When Relator, Elizabeth Coyle, started going through the patients' specific charts, she discovered that many of these patients who had been diagnosed with diabetes Types I and II, did not have diabetes.   Out of about three hundred (300) charts that she reviewed, probably fifty (50) to seventy-five (75) of the patients did not have diabetes.

288.    After the Relator, Elizabeth Coyle ,discovered that Complete Family Care had been diagnosing patients as diabetics who were not, she was confused and she discussed her findings with Tessa Gaugreaux who worked for Physicians Choice Laboratory Services ("PCLS"), and the Relator, Elizabeth Coyle, told her she didn't understand what was going on and why the patients would be diagnosed as diabetics when they were not.   Tessa Gaugreaux told her to go look at the type of insurance the patients had.   The Relator, Elizabeth Coyle, pulled out five (5) or six (6) charts, and all were Medicare patients.   The Relator, Elizabeth Coyle, took these findings back to

105

Tessa Gaugreaux, and Ms. Gaugreaux then stated words to the effect, "I know what that means – you have to try to put it together". Then, Relator, Elizabeth Coyle, realized it was upcoding.

289. The Relator, Elizabeth Coyle thereafter confronted one of the owners, Fran (Pachinger) Incandela in approximately late December of 2011, with the upcoding issue involving diabetics, and the Relator, Elizabeth Coyle, told her there were a lot of the patients who were being billed diabetic when they were not. Ms. Incandela stopped what she was doing and looked at Relator, Elizabeth Coyle, "like a deer caught in headlights" and said "Maybe they were borderline" or "Maybe it was a mistake".

290. The Relator, Elizabeth Merry, recalls the following patients were being diagnosed and billed as diabetic patients who were not, including Patient A, Patient B,[11] and also herself (but Relator, Elizabeth Merry, was insured by United Healthcare at the time and not Medicare).

291. It is Relator, Elizabeth Coyle's understanding that the use of the diabetes diagnosis is used to get more money from the government and/or insurance companies. It is also her understanding that diabetes is a condition that needs ongoing treatment and pays at a higher rate than some diagnoses such as, for example, a cold or an ear infection.

292. The Relators, Elizabeth Coyle and Elizabeth Merry, believe that the practice of upcoding involving low back pain and diabetes may have been going on for several years.

**5. Chad Adams, A Physicians Assistant, Seeing Patients Without A License, And Dr. Sugantharaj Pre-Signing Prescriptions.**

293. Chad Adams was a Physicians Assistant, but he could not pass his test and was not licensed, although at one point, he had a temporary license. Chad Adams took the test

---

[11] Patients referred to in this Complaint will be identified only by letters to preserve their confidentiality, but the actual patient names will be provided to the government and will be provided to the Defendants once the case comes out from seal as ordered by the Court and pursuant to the Federal Rules of Civil Procedure, and pursuant to an appropriate Protective Order.

106

approximately five (5) times and failed. The last time he took the test and failed was in early January of 2012, and he had been working at Complete Family Care since approximately mid-year 2010.

294. According to Relator, Elizabeth Merry, Chad Adams was seeing approximately twenty (20) to twenty-five (25) patients a day, five (5) days a week even though he did not have a license. Relator, Elizabeth Merry, states that when Dr. Sugantharaj was on vacation, Chad Adams was the lead provider and he was writing prescriptions for many of these patients.

295. Chad Adams also used prescription scripts that had been pre-signed by Dr. Sugantharaj. The Relator, Elizabeth Merry, saw this. Mr. Adams would fill out the prescriptions. The Relator, Elizabeth Merry, would estimate that there were several hundred prescriptions that had been pre-signed by Dr. Sugantharaj that were thereafter completed by Chad Adams. On other occasions, Chad Adams would write out the prescriptions and walk into the room where Dr. Sugantharaj was, and Dr. Sugantharaj would sign the prescriptions. On some occasions, prescriptions were also signed by Chad Adams, PA, and he was not licensed.

296. Chad Adams, PA, saw patients when he was not licensed for a little over an approximate two (2) year period, through July 2012. In or about July 2012, Chad Adams left the practice allegedly due to him getting married, and the practice thereafter would not allow him to come back until he was licensed.

297. The Relator, Elizabeth Merry, had knowledge that the following patients were issued prescriptions by Chad Adams that had been pre-signed by Dr. Sugantharaj, including Patient C, Patient D, and Patient E.

107

298.    The Relator, Elizabeth Merry was also a patient of Complete Family Care, LLC, and she retained some medical records indicating she had been seen and treated by Chad Adams, and he would issue her prescriptions as well that had been pre-signed by Dr. Sugantharaj.

299.    Chad Adams, PA, saw patients on numerous occasions, especially when Dr. Sugantharaj was out of town.   On one occasion, Dr. Sugantharaj went out of the country, including to England for approximately two (2) weeks in or about June or July of 2011.   It is not known whether patients were being charged as if Dr. Sugantharaj saw them during this time period, but this should be determined.   Additionally, given his practice of signing the medical records of patients who had been seen by Chad Adams sometimes months after the fact, it may be worthwhile seeing if Dr. Sugantharaj signed any charts during the time he was overseas.

300.    In April of 2012, the Relator, Elizabeth Coyle, was in a weekly meeting with Dr. Sugantharaj where she had pulled two (2) charts to ask Dr. Sugantharaj questions about.   One of the patients was Patient F (DOB: 10/13/69) who was a pain patient that had seen Chad Adams. The Relator, Elizabeth Coyle, had the chart open and was asking Dr. Sugantharaj about her being in a neuropathy/pain study, and she observed him signing his name next to Chad Adams' name on the visit pages.   Dr. Sugantharaj then picked up the other chart on a patient, Patient G, that the Relator, Elizabeth Coyle, had pulled and started looking through the visit pages and a couple had been signed by Chad Adams, and she observed him again signing his name next to Chad Adams' name.

301.    It is Relator, Elizabeth Merry's understanding that Complete Family Care, LLC, billed Medicare, TennCare, and other governmental providers for many patients seen by Chad Adams when he was unlicensed.

**6.    Unlicensed Nurse Seeing Patients And Providers Unlicensed For Suboxone Seeing Patients.**

108

302.   The Relators, Elizabeth Coyle and Elizabeth Merry, also discovered that Laure Marlow, LPN, had worked at Complete Family Care, LLC for approximately a year in 2010 when she did not have a medical license.   Laure Marlowe was an LPN who worked at Complete Family Care from about 2010 to August 2011.

**7.     Suboxone Issues**

303.   It is the Relators, Elizabeth Coyle and Elizabeth Merry's understanding that Suboxone is a treatment for opiate dependency and that only physicians licensed for Suboxone with the DEA could see Suboxone patients, but during their employment, they observed other providers such as Chad Adams, PA, Lee Simmons, PA, Tim Fox, NP, and Judy Smith, NP, treating Suboxone patients.

**8.     HDL Lab Fraud/Unnecessary Office Visits**

304.   Relator, Elizabeth Merry, states that in or around December of 2011, Complete Family Care, LLC, started sending out all HDL labs to PCLS on patients "To get more money in the office", according to Robert Pachinger.   The Relator, Elizabeth Merry, was instructed by Beverly Baird to call patients and say they have their lab results and they need to schedule a follow-up visit so they would come in for a full round of blood work, including being tested for HDL.   According to the Relator, Elizabeth Merry, once a month when the patients' urine test results would come in, she would call them in for this follow-up visit. The blood work would then be sent to PCLS.   This process had been going on since approximately in or around December of 2011, and continued for a couple of months, and then they went back to testing only once a month instead of twice a month because Relator, Elizabeth Merry, believes patients were complaining.

109

305.    Relator, Elizabeth Merry, was also instructed by Beverly Baird to call the patients who had the blood work done to have them come back in for an "office visit" so they could be "given the results".  This was for <u>all results</u> – even results that were perfectly normal.  When Relator, Elizabeth Merry, would tell the patients they had to come in for an office visit for "the results", the patients got scared.  An office visit was medically unnecessary just to receive the results of the lipid tests and billing for it was fraudulent because the office visit was simply so Complete Family Care, LLC, could bill out the patients for a half hour office visit using CPT Code 99201.  This lipid test for HDL labs was done on approximately eight (8) to ten (10) patients per day beginning December of 2011, but this practice only lasted a few months.

306.    The Relator, Elizabeth Merry, believes all were fraudulent practices because these labs and the office visits were not medically necessary and were being done solely to generate revenue, and Relators believe similar fraudulent practices may have been implemented at other medical practices involved in the kickback scheme.

**F.    Additional Allegations Involving Other Clinics Receiving Kickbacks From Shaun Thompson/Douglas Smith/PCLS**

307.    Since both Complete Family Care and Advanced Pain Therapeutics of Knoxville, TN, LLC/Southeast Spine & Pain Associates, LLC began medically unnecessary monthly urine testing and began requiring medically unnecessary psychological testing (self-tests) monthly shortly after receiving the kickbacks and switching to PCLS, as well as sending out 100% of their labs for "confirmation testing", all medical clinics found to be involved in the kickback scheme should be audited to determine if they have also engaged in similar fraudulent practices as this conduct appears to be part of the overall conspiracy.

## XI.    <u>SPECIFIC COUNTS AND RELIEF SOUGHT</u>

110

308. The United States and the State of Tennessee were damaged as a result of the conduct of Defendants in submitting or causing to be submitted false or fraudulent claims, statements, and records and claims for payment. Defendants have conspired to defraud the United States and the State of Tennessee, and profited unlawfully.

## COUNT ONE

309. The Relators re-allege Paragraphs 1 through 308, and incorporate them herein by reference as if fully set forth herein.

310. Physicians Choice Laboratory Services, LLC, violated the Federal False Claims Act in that it:

    a. Was eligible for reimbursement by Medicare and Medicaid programs only if it complied with Medicare and Medicaid program rules and regulations;

    b. Compliance with the Anti-Kickback Act was a prerequisite for payment of claims by the federal Medicare and Medicaid programs;

    c. PCLS certified in its filings that it understood that payment by the Medicare and Medicaid programs required adherence to the Department of Human and Health Services (hereinafter "HHS") regulations; and

    d. PCLS was not adhering to HHS regulations because it violated the Anti-Kickback Act by:

        (1) Knowingly, with deliberate ignorance, or reckless disregard, provided remuneration as alleged in the Complaint, including computers, tables, equipment, big screen monitors, printers, computer servicing, consultants, and provided employees and software to medical clinics;

111

(i) PCLS provided such remuneration with the intent to induce the medical clinics to use PCLS services exclusively and to make referrals to PCLS;

(ii) This remuneration was made directly by PCLS or through their proxies or associates or affiliated companies.

311. PCLS also knowingly, with deliberate ignorance, or reckless disregard wrote off bills of self-pay patients, and wrote off co-payments and deductibles for physicians' patients with the intent to induce the physicians to use PCLS' services exclusively, and to make referrals to PCLS.

312. Violations of the Anti-Kickback Statute constitute a violation of the False Claims Act.

313. PCLS' concealed violations of the Anti-Kickback Statute caused the Medicare and Medicaid programs to pay for labs that were not eligible for reimbursements.

314. PCLS violated the False Claims Act in that it made, used, or caused to be made or used, records or statements to get false or fraudulent claims paid for or approved by the United States knowing such records or statements were false.

315. Upon information and belief, the United States has suffered significant monetary damages directly and proximately caused by PCLS' violations of the Federal False Claims Act.

316. All Defendants who accepted remuneration are also in violation of the Anti-Kickback Statute and False Claims Act.

COUNT TWO

317. The Relators re-allege Paragraphs 1 through 316, and incorporate them herein by reference as if fully set forth herein.

112

318.     PCLS and the Defendants accepting remuneration violated the Tennessee Medicaid False Claims Act by falsely certifying eligibility for reimbursement by the Tennessee Medicaid program (hereinafter "TennCare") knowing it was violating federal and state laws prohibiting providing remunerations to induce or make referrals.

## COUNT THREE

319.     The Relators re-allege Paragraphs 1 through 318, and incorporate them herein by reference as if fully set forth herein.

320.     In violation of 31 U.S.C. § 3729(a)(1), Defendants knowingly or acting with reckless disregard or deliberate ignorance of their truth or falsity have presented or caused to be presented false or fraudulent claims for payment or approval to the United States, including claims for medical services that were not performed, that were not medically necessary, that were improperly coded, or that represented reimbursements that should have been refunded as overpayments to the United States.

321.     By virtue of these false or fraudulent claims on the part of Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, as determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT FOUR

322.     The Relators re-allege Paragraphs 1 through 321, and incorporate them herein by reference as if fully set forth herein.

323.     Defendants falsely certified their compliance with Federal, State and local laws and regulations, and because such certification is a condition of coverage by Medicare, TennCare, and

113

Medicaid, Defendants violated 31 U.S.C. § 3729(a)(2) in that it knowingly submitted false claims to Medicare, TennCare, and Medicaid.

324.    By virtue of Defendants' false and fraudulent certifications, Defendants caused the United States to suffer damages and the United States is therefore entitled to treble damages under the False Claims Act, as determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

COUNT FIVE

325.    The Relators re-allege Paragraphs 1 through 324, and incorporate them herein by reference as if fully set forth herein.

326.    In violation of 31 U.S.C. § 3729(a)(7), Defendants knowingly or acting with reckless disregard or deliberate ignorance of their truth or falsity made, used, or caused to be made or used false records or false statements, including false certifications by Defendants in submitting claims, to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

327.    By virtue of using or making false records or false statements, Defendants caused the United States to suffer damages and the United States is therefore entitled to treble damages under the False Claims Act, as determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

COUNT SIX

328.    The Relators re-allege Paragraphs 1 through 327, and incorporate them herein by reference as if fully set forth herein.

114

329.     This is a claim for the recovery of monies paid by the United States and the State of Tennessee to Defendants as a result of mistaken understandings of fact.

330.     The false claims that Defendants submitted to the United States and the State of Tennessee were paid by the United States and the State of Tennessee based upon mistaken or erroneous understandings of material facts.

331.     The United States and the State of Tennessee, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of Defendants' certifications and representations, paid Defendants certain sums of money to which Defendants were not legally entitled and Defendants are thus liable to account and pay such amounts, as determined at trial, to the United States and the State of Tennessee.

## COUNT SEVEN

332.     The Relators re-allege Paragraphs 1 through 331, and incorporate them herein by reference as if fully set forth herein.

333.     This is a claim for recovery of monies by which Defendants have been unjustly enriched.

334.     By directly or indirectly obtaining Federal and State funds to which Defendants were not legally entitled, Defendants were unjustly enriched and are liable to account and pay such amounts, as determined at trial, to the United States and the State of Tennessee.

## COUNT EIGHT

335.     The Relators re-allege Paragraphs 1 through 334, and incorporate them herein by reference as if fully set forth herein.

115

336.   This is a claim for disgorgement of illegal profits earned by Defendants as a result of statutory violations in the manner in which Defendants maintained its records and accounts and in failing to make refunds of overpayments due to the United States and the State of Tennessee.

337.   Defendants concealed their illegal activities through false statements, false claims, false records, and its failure to abide by its statutory and regulatory duties to disclose the existence of such overpayments.

338.   The United States and the State of Tennessee did not detect Defendants' illegal conduct.

339.   The United States and the State of Tennessee request that the Court exercise equitable and statutory powers to require Defendants to disgorge all illegal profits earned as a result of Defendants' statutory violations, and to impress a resulting trust on all assets purchased by said Defendants with monies that should have been refunded and paid to the U.S. government and/or the State of Tennessee.

340.   The United States and the State of Tennessee request a full accounting of all revenues, as well as interest, received by Defendants during all relevant times.

COUNT NINE

341.   The Relators re-allege Paragraphs 1 through 340, and incorporate them herein by reference as if fully set forth herein.

342.   This is a claim for recoupment of monies unlawfully paid by the United States and the State of Tennessee to Defendants contrary to statute or regulation.

343.   The United States and the State of Tennessee paid Defendants certain sums of money to which Defendants were not entitled and Defendants are thus liable under the law of

116

recoupment to account and return such sums, as determined at trial, to the United States and the State of Tennessee.

COUNT TEN

344.     The Relators re-allege Paragraphs 1 through 343, and incorporate them herein by reference as if fully set forth herein.

345.     Defendants made material and false representations in the submissions of claims for reimbursement from Federal and State funded health benefit programs and in the concealment of overpayments with the intention that the United States and the State of Tennessee be deprived of refunds or be caused to pay funds to Defendants to which they were not legally entitled.

346.     Had the true state of facts been known to the United States and the State of Tennessee, the United States and the State of Tennessee would not have made reimbursements to Defendants or would have sought recovery of overpayments as provided by law.

347.     As a result of the conduct of Defendants, the United States and the State of Tennessee have been damaged in an amount to be determined at trial.

COUNT ELEVEN

348.     The Relators re-allege Paragraphs 1 through 347, and incorporate them herein by reference as if fully set forth herein.

349.     This is a claim for common law conversion on behalf of the United States and the State of Tennessee.

350.     As a result of the conduct of Defendants in making false claims and in failing to make refunds of overpayments, Defendants exercised an unauthorized right of ownership over funds belonging to the United States and the State of Tennessee and has deprived the United States

117

and the State of Tennessee of these sums permanently and for an indefinite time inconsistent with the rights of the United States and the State of Tennessee for which the Defendants owe compensatory damages and punitive damages.

## COUNT TWELVE

351.    The Relators re-allege Paragraphs 1 through 350, and incorporate them herein by reference as if fully set forth herein.

352.    In violation of T.C.A. § 71-5-182(a)(1)(A), Defendants knowingly or acting with reckless disregard or deliberate ignorance of their truth or falsity presented or caused to be presented false or fraudulent claims for payment or approval to the State of Tennessee and the United States, including claims for medical services that were not performed, that were not medically necessary, that were improperly coded, or that represented reimbursements that should have been refunded as overpayments to the State of Tennessee and the United States.

353.    By virtue of these false or fraudulent claims on the part of Defendants, the State of Tennessee and the United States suffered damages and therefore is entitled to treble damages under the Tennessee Medicaid False Claims Act, as determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT THIRTEEN

354.    The Relators re-allege Paragraphs 1 through 353, and incorporate them herein by reference as if fully set forth herein.

355.    In violation of T.C.A. § 71-5-182(a)(1)(B), Defendants knowingly or acting with reckless disregard or deliberate ignorance of their truth or falsity made, used, or caused to be made or used, false records or statements, including false certifications and representations by

118

Defendants upon submission or resubmission of false claims for reimbursements under Medicare, Medicaid and TennCare, for the purpose of obtaining payment or approval of false or fraudulent claims from the State of Tennessee and the United States.

356.    By virtue of using or making false records or false statements, Defendants caused the State of Tennessee and the United States to suffer damages and the State of Tennessee and the United States are therefore entitled to treble damages under the Tennessee Medicaid False Claims Act, as determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT FOURTEEN

357.    The Relators re-allege Paragraphs 1 through 356, and incorporate them herein by reference as if fully set forth herein.

358.    In violation of T.C.A. § 71-5-182(a)(1)(D), Defendants knowingly or acting with reckless disregard or deliberate ignorance of their truth or falsity made, used, or caused to be made or used false records or false statements, including false certifications by Defendants in submitting claims, to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Tennessee and the United States.

359.    By virtue of using or making false records or false statements, Defendants caused the State of Tennessee and the United States to suffer damages and the State of Tennessee and the United States are therefore entitled to treble damages under the Tennessee Medicaid False Claims Act, as determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT FIFTEEN

360.    The Relators re-allege Paragraphs 1 through 359, and incorporate them herein by reference as if fully set forth herein.

119

361.    As a result of the conduct of Defendants herein, the Defendants have violated the provisions of the Fraud & Abuse Statute, 42 U.S.C. §§ 1320a-7a & -7b, and the Relators pray that the maximum civil penalties as specified thereunder be assessed, and treble damages be awarded.

## COUNT SIXTEEN

362.    The Relators re-allege Paragraphs 1 through 361, and incorporate them herein by reference as if fully set forth herein.

363.    Relator, J.D. Jenkins, sues Southeast Spine & Pain Associates and Optimal Medical Management, LLC, for wrongful discharge and breach of contract.

364.    As a result of his wrongful discharge and Defendants' breach of contract, Plaintiff, J.D. Jenkins, sustained a loss of wages, and will continue to sustain a loss of wages in the future, and he sustained substantial emotional distress, and Defendants' conduct was intentional, reckless or malicious sufficient to justify substantial punitive damages.

365.    Relator/Plaintiff, J.D. Jenkins, sues said Defendants for common law wrongful discharge pursuant to T.C.A. § 50-1-304, and for breach of contract.

## PRAYER FOR RELIEF

Wherefore, Relators demand on behalf of the United States and the State of Tennessee judgment in their favor against Defendants as follows:

1.    For the United States and the State of Tennessee to be awarded full damages, trebled as required by law, and such civil penalties as are permitted by law, together with such further relief as may be just and appropriate, and punitive damages.

2.    For damages and recovery of such amounts by which Defendants were unjustly enriched or which Defendants retained illegally, together with interest, costs, expenses, and all

other relief that may be just and proper, including for the Court to declare a resulting trust on all assets acquired by Defendants with money illegally obtained from the U.S. Government and the State of Tennessee.

3.      For an accounting of all revenues unlawfully obtained or retained by Defendants and for the disgorgement of such funds, together with further equitable relief as may be just and proper, including that the Court declare a resulting trust on all assets acquired by Defendants, that was acquired with monies that should have been returned to the U.S. Government and the State of Tennessee.

4.      For common law fraud and conversion, the United States and the State of Tennessee seek compensatory and punitive damages in an amount to be determined at trial, together with costs and interest, and all other relief as may be just and proper.

5.      On the Sixteenth count, J.D. Jenkins acting individually, seeks compensation and punitive damages from Defendants, Southeast Spine & Pain Associates, LLC and Optimal Medical Management, LLC for their breach of contract and for his wrongful discharge, and he seeks attorney fees and costs.

6.      The United States and the State of Tennessee request that Defendants be ordered to cease and desist from submitting false claims and to comply fully with the statutes and regulations of the United States and the State of Tennessee.

7.      For Defendants to be barred from participating in Federally funded health care programs and from the State of Tennessee's health care program.

8.      Relators further request that they be awarded the maximum amount permitted pursuant to 31 U.S.C. § 3730(d), and T.C.A. §§ 71-5-101, *et seq.*

121

9.    Additionally, Relators request all costs, including court costs, expert fees, investigative expenses, and attorney's fees incurred by Relators in the prosecution of this suit.

10.    Relators request that they and the United States and the State of Tennessee be granted all other relief that the Court deems appropriate and proper.


RESPECTUFLLY SUBMITTED this the 7th day of January, 2014.


By: _____

David A. Burkhalter, II
Attorney for Relators
**BURKHALTER, RAYSON & ASSOCIATES, P.C.**
111 S. Central Street, P.O. Box 2777
Knoxville, TN 37901
(865) 524-4974 Phone
(865) 524-0172 Facsimile

122

## CERTIFICATE OF SERVICE

I certify that, pursuant to the terms and requirements of the United States False Claims Act, 31 U.S.C. § 3730(b)(2) and Fed.R.Civ.P. 4(d)(4), true and correct copies of the foregoing were served on January 7, 2014, by personal delivery and/or certified mail, return receipt requested, addressed to the following:

Eric H. Holder, Jr.
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001
**Attn: United States False Claims Act filing**

William C. Killian, Esq.
United States Attorney for the Eastern District of Tennessee
800 Market Street, Suite 211
Knoxville, TN 37902
**Attn: United States False Claims Act filing**

and

Robert E. Cooper, Jr.
State Attorney General
P.O. Box 20207
Nashville, TN 37202-0207
**Attn: Tennessee Medicaid/Tenncare False Claims Act**

David A. Burkhalter, II
Attorney for Relators

123